ILLINOIS POWER COMPANY *et al.*, Petitioners, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Fifth District    No. 5—98—0808

Opinion filed September 6, 2000.

Joseph L. Lakshmanan and Bradley J. Johnson, both of Illinois Power

Company, of Decatur, Leonard A. Gail and Steven Derringer, both of Bartlit, Beck, Herman, Palenchar & Scott, of Chicago, and Mark J. Ballard, of Campbell, Black, Carnine, Hedin, Ballard & McDonald, of Mt. Vernon, for petitioner Illinois Power Company.

William J. Niehoff, of St. Louis, Missouri, and Mark S. Schuver and Ann C. Barron, both of Mathis, Marifian, Richter & Grandy, Ltd., of Belleville, for petitioners Ameren Services Company, Central Illinois Public Service Company and Union Electric Company.

Dale E. Thomas and C. Cameron Findlay, both of Sidley & Austin, and Anne R. Pramaggiore, of Commonwealth Edison Company, both of Chicago, for petitioner Commonwealth Edison Company.

John P. Kelliher, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

James E. Ryan, Attorney General, and Richard A. Devine, State's Attorney, of Chicago (Edward Washington II, Matthew L. Harvey, and Francis L. Ostian, Assistant Attorneys General, and Marie Spicuzza and Leijuana Doss, Assistant State's Attorneys, of counsel), for respondents People of the State of Illinois and People of Cook County.

Edward C. Fitzhenry, of Lueders, Robertson & Konzen, of Granite City, for respondent Illinois Industrial Energy Consumers.

Christopher J. Townsend and David I. Fein, both of Piper, Marbury, Rudnick & Wolfe, of Chicago, for respondent Enron Energy Services, Inc.

Robert Kelter, of Chicago, for respondent Citizens Utility Board.

No brief filed for other respondents.

JUSTICE CHAPMAN delivered the opinion of the court:

This appeal is from a final order and the adoption of final rules by the Illinois Commerce Commission (ICC), which adopted regulations implementing section 16—121 of the Electric Service Customer Choice and Rate Relief Law of 1997 (the Customer Choice Law) (220 ILCS 5/16—121 (West 1998)). Petitioners complain that certain of these rules violate the right to commercial free speech, are in conflict with the Customer Choice Law, and are arbitrary and capricious. We note that petitioner Commonwealth Edison Company's appeal has been dismissed. We affirm.

## BACKGROUND

Before the Customer Choice Law, Illinois electric customers received virtually all their electricity from their local utility companies.

Each local utility company was vertically integrated, meaning that each one produced electric energy, transmitted it to the general vicinity of the consumer, and distributed it to the customers' businesses and homes. These utilities were traditionally very heavily regulated, due largely to the fact that they faced virtually no competition for the sale of electricity in their respective service areas.

The enactment of the Customer Choice Law moved the Illinois electric industry from this heavily regulated world toward a competitive marketplace. The Customer Choice Law pursues the competitive market through the deregulation of certain products and services called "competitive services." The Customer Choice Law allows an electric utility to offer any competitive service to customers without ICC approval.

The Customer Choice Law also opened the electricity market to participants other than the existing, vertically integrated utilities. The Customer Choice Law allows the creation of entities called "alternative retail electric suppliers" (ARES), which are authorized to sell and market electricity to customers. ARES may or may not be affiliated with an existing utility company. Therefore, the Customer Choice Law contemplates three sources from which customers may purchase electricity in this competitive market: traditional electric utilities, ARES that are affiliated with a utility company, or ARES that are unaffiliated with an existing utility company.

Because facilities that transmit and distribute electricity are not easily replicated, the Customer Choice Law provides that the existing utility companies will continue to control the transmission and distribution of electricity in their service areas, even after the introduction of competition to the market. There is a fear, however, that the utilities will use their control of the delivery services to give competitive advantages to ARES that are affiliated with the utilities, to the detriment of unaffiliated ARES and, ultimately, to the detriment of the successful creation of a competitive market. Therefore, the Customer Choice Law provides for the establishment of regulations that are to prevent a utility from using its control of the transmission and distribution (the delivery services) to discriminate against electricity service providers. These regulations, which were intended to implement section 16—121 of the Customer Choice Law, were adopted by the ICC in the form of final rules. Petitioners appeal, complaining that some of these rules are unconstitutional and/or that they are invalid for other reasons.

## STANDARD OF REVIEW

■ Under the Public Utilities Act (220 ILCS 5/10—201(d) (West

1998)), any party who appeals an order of the ICC bears the burden of proving all issues raised on appeal and must overcome the presumption of reasonableness accorded to ICC orders. In analyzing ICC orders, Illinois courts have held that decisions of the ICC are entitled to great deference, because they are the judgment of an administrative body that is " 'informed by experience.' " *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994), quoting *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960).

■ The ICC is an administrative agency, and judicial review of its orders is limited. See *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 366 (1992). Although the ICC is not required to make findings regarding every step, its findings of fact must be sufficient to allow for informed judicial review, and they will be affirmed if they are based on substantial evidence in the record. See *Hartigan*, 148 Ill. 2d at 366. The ICC's findings of fact are *prima facie* correct and will not be overturned by a reviewing court unless they are against the manifest weight of the evidence, beyond the statutory authority of the ICC, or violative of constitutional rights. See *Hartigan*, 148 Ill. 2d at 367.

## DISCUSSION

Petitioners assert that certain sections of the final order of the ICC are constitutionally invalid and should be struck down. First, petitioners assert that section 450.25 of the final rules (83 Ill. Adm. Code § 450.25 (eff. November 7, 1998)) interferes with constitutionally protected commercial speech because it bans joint advertising and marketing by a utility and its affiliated interests. Petitioners also allege that sections 450.20(b) and (g) and section 450.140(d) of the final rules (83 Ill. Adm. Code §§ 450.20(b), (g), 450.140(d) (eff. November 7, 1998)) are inconsistent with section 16—102 of the Customer Choice Law because they reregulate services which that law deregulated and are therefore beyond the ICC's authority. Finally, petitioners assert that several other sections of the final rules are arbitrary and capricious and are unsupported by substantial evidence. Petitioners seek the reversal of these sections of the final rules or a reversal and remand to the ICC for further proceedings.

### Free Speech Issue

Petitioners assert that section 450.25 of the final rules violates the free speech guarantee of the United States Constitution. Section 450.25 prohibits an electric utility from jointly advertising or jointly marketing its services or products with those of an affiliated interest in competition with ARES. Joint advertising refers to advertising that covers two or more firms, while joint marketing refers to arrange-

ments in which two or more firms work together to provide products or services to customers.

The ICC stated in its second preliminary order that allowing joint marketing could "result in the transfer of valuable information and provide inherent market advantages" to the affiliates of the utility companies. The ICC was concerned that since unaffiliated ARES might not have the ability to jointly market with the owner of the delivery services facilities (the utilities), the affiliates which could jointly market could have an advantage that could not be duplicated by unaffiliated ARES. The ICC stated, "[There are] simply too many unknown advantages that a utility's affiliated ARES may have over competitors due to the utility's control over the transmission and distribution system and the services and information related thereto."

This finding of the danger of joint marketing was supported by a number of witnesses who testified before the Commission and expressed concern that joint advertising and marketing between utilities and their affiliates would give customers the impression that their utility service would be better if they purchased it from the utility affiliates.

■ The United States Supreme Court recognizes a distinction between speech that promotes a commercial transaction and other varieties of speech. See *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456-57, 56 L. Ed. 2d 444, 452-53, 98 S. Ct. 1912, 1918 (1978). Speech that promotes commercial transactions is traditionally subject to governmental regulation more than other types of speech. See *Ohralik*, 436 U.S. at 456-57, 56 L. Ed. 2d at 452-53, 98 S. Ct. at 1918. Therefore, the constitution affords less protection to commercial speech than to other constitutionally guaranteed expression. See *Ohralik*, 436 U.S. at 456-57, 56 L. Ed. 2d at 452-53, 98 S. Ct. at 1918. States may regulate commercial speech that is demonstrably false, deceptive, or misleading. See *Friedman v. Rogers*, 440 U.S. 1, 9, 59 L. Ed. 2d 100, 110, 99 S. Ct. 887, 894 (1979). The first amendment does not prohibit states from insuring that the stream of commercial information flows cleanly as well as freely. See *Friedman*, 440 U.S. at 10, 59 L. Ed. 2d at 110, 99 S. Ct. at 894.

■ The reviewing court is to apply the intermediate level of scrutiny to the regulation of commercial speech. See *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623, 132 L. Ed. 2d 541, 549, 115 S. Ct. 2371, 2375-76 (1995). The determination of the appropriateness of state regulation of commercial speech involves a four-part analysis: (1) the expression must be protected by the first amendment, (2) the asserted government interest must be substantial, (3) the regulation must directly advance the governmental interest asserted, and (4) the

regulation must be no more extensive than necessary to serve the interest. See *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 566, 65 L. Ed. 2d 341, 351, 100 S. Ct. 2343, 2351 (1980). In order to satisfy the last prong, the state must show not that the regulation is the least restrictive means but that it is narrowly tailored to achieve the desired result. See *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480, 106 L. Ed. 2d 388, 404, 109 S. Ct. 3028, 3035 (1989).

■ In applying this analysis to the facts, we conclude that the restraint on joint advertising and marketing passes muster. The first prong, that the expression is protected by the first amendment, is met because commercial speech has long been recognized by the United States Supreme Court as constitutionally protected speech. See *Ohralik*, 436 U.S. at 456, 56 L. Ed. 2d at 453, 98 S. Ct. at 1918; *Friedman*, 440 U.S. at 10, 56 L. Ed. 2d at 110, 99 S. Ct. at 894; *Went For It, Inc.*, 515 U.S. at 623, 132 L. Ed. 2d at 549, 115 S. Ct. at 2375.

Next, we must determine whether the state has a substantial interest in regulating joint advertising and marketing between utilities and their affiliates. When the legislature decided to open the electricity market to competition, it appointed the ICC to preside over the development of the competitive market. The General Assembly directed the ICC to promulgate rules ensuring nondiscrimination in the services provided to a utility's affiliate and those provided to unaffiliated ARES. In order to insure that nondiscrimination, there must be no unfair advantage given to ARES that are utility affiliates simply because of their status as affiliates. Therefore, we find that the state has a substantial interest in regulating joint advertising and marketing in order to insure nondiscrimination in the development of a competitive market for utility service.

The third prong of the test requires that the challenged regulation directly advance the substantial governmental interest. In ordering the restriction on joint marketing, the ICC found that, in the absence of competition, any benefits to a utility and its affiliate from joint marketing would not necessarily be transferred to customers. Without the restriction, competition for business might be less robust. This finding was supported by testimony that allowing a utility and its affiliate to jointly market creates an entry barrier to unaffiliated ARES, thereby stifling competition and defeating the purpose of the deregulation. In addition, there was testimony regarding the likelihood of confusion and deception if joint marketing were allowed. If utility affiliates advertise themselves jointly with an existing utility, they imply a distribution affiliation that no longer exists due to the deregulation. Therefore, customers should not choose their service provider decision

on that basis. If left unregulated, joint marketing could lead to discrimination between affiliates and unaffiliated ARES because of customer confusion and the creation of entry barriers. Hence, we believe that the regulation of joint advertising and marketing advances the substantial governmental interest of developing a competitive utility-provision market.

Finally, we determine whether the regulation is sufficiently tailored to serve the state's interest in creating a competitive market. The regulation must be no more extensive than necessary to serve the interest advanced. See *Central Hudson Gas & Electric Corp.*, 447 U.S. at 566, 65 L. Ed. 2d at 351, 100 S. Ct. at 2351. The ICC order still allows all utilities and ARES to advertise on their own behalf. It also allows affiliated ARES to use the utilities' corporate name and logo. 83 Ill. Adm. Code § 450.25(b) (eff. November 7, 1998). The order simply prevents utilities and their affiliated ARES from joining marketing efforts and thereby misleading customers. Such confusion on the part of customers may disadvantage unaffiliated ARES that do not enjoy the benefit of joint marketing with the existing utilities. In addition, the ICC stated in its second preliminary order that the ban on joint marketing is to be contingent and that it may be revisited after the transition period of deregulation is past. Therefore, we conclude that the provision banning joint advertising and marketing is no more extensive than necessary to achieve the state's interest in insuring a competitive market for electric utility service.

Since the ban on joint advertising and marketing passes muster under the intermediate level of scrutiny for the regulation of commercial speech, we reject petitioners' claims that the ban is unconstitutional, and we uphold section 450.25 of the final rules and order.

### Conflict with Customer Choice Law

Petitioners next assert that several sections of the final rules violate the Customer Choice Law. Petitioners claim that sections 450.20(b), 450.20(g), and 450.140(d) of the final rules all regulate "competitive services"—a statutorily defined class of services that the Customer Choice Law declares to be free from regulation.

Section 16—102 of the Customer Choice Law defines competitive services as follows:

> " 'Competitive service' includes (i) any service that has been declared to be competitive pursuant to Section 16—113 of this [Public Utilities] Act, (ii) contract service, and (iii) services, other than tariffed services, that are related to, but not necessary for, the provision of electric power and energy or delivery services." 220 ILCS 5/16—102 (West 1998).

Section 16—116(b) limits ICC regulation of these competitive services:

· "(b) An electric utility may offer any competitive service to any customer or group of customers without filing contracts with or seeking approval of the Commission, notwithstanding any rule or regulation that would require such approval. The Commission shall not increase or decrease the prices, and may not alter or add to the terms and conditions for the utility's competitive services, from those agreed to by the electric utility and the customer or customers." 220 ILCS 5/16—116(b) (West 1998).

Petitioners allege that several rules in the ICC's order violate these sections of the Customer Choice Law. First, they assert that final rule 450.20(g) violates the Customer Choice Law because it prohibits an electric utility from conditioning a customer's eligibility for billing experiments or for contracts for competitive services on the customer's taking goods or services from an affiliated interest. Petitioners also claim that final rule 450.20(b) prohibits an electric utility from offering to its affiliates in competition with ARES different terms and conditions from those it offers unaffiliated ARES. Finally, petitioners allege that the portion of final rule 450.140(d) that requires a utility to log each time it offers competitive services to affiliated interests or customers of affiliated interests also violates the law.

As a general rule, in construing a statute to ascertain the legislature's intent, a court should read the statute as a whole or in its entirety, and the legislative intent should be gathered from the whole act rather than just one part. See *Harvel v. City of Johnston City*, 146 Ill. 2d 277, 283-84 (1992). In.reading the Customer Choice Law as a whole, we believe that the intent of the General Assembly was to give the ICC the authority to oversee the restructuring of the Illinois electric marketplace and to insure a competitive retail market for the provision of electric service. In section 16—101A(d) of the Customer Choice Law, the legislature states, "The [ICC] should act to promote the development of an effectively competitive electricity market that operates efficiently and is equitable to all customers." 220 ILCS 5/16—101A(d) (West 1998). The Customer Choice Law also seeks to "promote fair and open competition in the provision of electric power and energy." 220 ILCS 5/16—118(a) (West 1998). We conclude that the final rules of which petitioners complain are entirely in compliance with the intent of the Customer Choice Law.

■ The final rules of which petitioners complain are designed to prevent the utilities from bestowing unfair advantages upon their affiliates at the possible expense of free competition between the affiliates and ARES. This is valid and is in line with the General Assembly's authority to the ICC to create a competitive market.

Furthermore, none of the rules are in conflict with the Customer Choice Law. These three sections of the order do not require that the utilities seek ICC approval to offer competitive services, do not increase or decrease utility prices, and do not alter the terms and conditions of the utility's competitive services. To the contrary, these three provisions meet the goal of insuring a competitive marketplace by protecting the unaffiliated ARES from unfair practices of affiliated ARES without violating the limits on the ICC's powers as set forth in section 16—116. Therefore, we reject petitioners' allegations that sections 450.20(b) and (g) and section 450.140(d) of the final rules are in contradiction to the Customer Choice Law.

Petitioners also claim that sections 450.130(c) and (d) of the final rules (83 Ill. Adm. Code §§ 450.130(c), (d) (eff. November 7, 1998)), which require utilities to compile information on each of the ARES, including its name, address, phone and fax numbers, and Internet address information, and provide it to the public upon request, violate section 16—117(g)(4)(B) of the Customer Choice Law (220 ILCS 5/16—117(g)(4)(B) (West 1998)). That section requires that the ICC shall make available upon request and at no charge, through the State of Illinois world wide web site, "a list of all certified alternative retail electric suppliers serving residential and small commercial retail customers within the service territory of each electric utility." 220 ILCS 5/16—117(g)(4)(B) (West 1998). Petitioners complain that sections 450.130(c) and (d) of the final rules shift to the utilities the responsibility imposed on the ICC by the Customer Choice Law.

We, however, find no conflict between these final rules and the Customer Choice Law. The Customer Choice Law requires only that the ICC make information regarding ARES available on the State of Illinois website. It does not require that this information be information that the ICC itself has compiled. Therefore, no conflict exists between these rules and the Customer Choice Law. Furthermore, from a cost standpoint, it makes better financial sense for the utilities to provide this information to the ICC. The utilities will be interacting daily with both affiliated and unaffiliated ARES and will therefore already have the information compiled and can easily give the information to the ICC. This will save the ICC the expense of "reinventing the wheel" by compiling information that is already at the disposal of the utilities, thereby saving the taxpayers an unnecessary expense.

We therefore reject petitioners' claims that several sections of the final rules are in conflict with the Customer Choice Law, and we uphold each of the sections as valid.

### Arbitrary and Capricious Rules

■ Petitioners finally allege that several final rules are arbitrary

and capricious, are unsupported by substantial evidence, or are based on an inadequate record. Some of the rules of which petitioners complain have already been discussed in this opinion. The justification for the promulgation of the rules contained in that discussion applies equally to the petitioners' challenges in this section. Hence, in this section, we will only address the rules that have not already been discussed.

Petitioners complain of section 450.20(a) of the final rules (83 Ill. Adm. Code § 450.20(a) (eff. November 7, 1998)). Section 450.20(a) prohibits an electric utility from providing advantages in connection with tariffed services to any of its affiliates that are not given to unaffiliated ARES. They also allege that section 450.20(f) (83 Ill. Adm. Code § 450.20(f) (eff. November 7, 1998)) is invalid. Section 450.20(f) applies to tariffed services and requires that an electric utility must offer the same rebate, discount, or fee waiver to all unaffiliated ARES customers that it offers to affiliated customers. Petitioners complain that these rules include both essential and nonessential tariffed services in their purview, which is in contradiction to the ICC's rationale for the rule. The ICC's rationale, as contained in the second preliminary order, is as follows:

> "The Commission is concerned that a utility could discount the price for delivery service to an affiliated interest or a customer of an affiliated interest and then conceal that discount by burying it in a bundled service (e.g.[,] contract service or billing experiments). Delivery services are the heart of access to the essential transmission and distribution system, and until delivery services are declared competitive under Section 16—113 of the [Public Utilities] Act, there should be no discrimination with regard to the price of delivery services."

In its rationale for this rule the ICC makes no distinction between essential and nonessential delivery services. In fact, petitioners admit that the ICC has never addressed the issue, much less reached a supportive conclusion. However, petitioners argue that both essential and nonessential services are included in the rules in contradiction of the Customer Choice Law. They ask us to draw the distinction between essential and nonessential tariffed services as applied to the Customer Choice Law and the ICC's final rules. We decline to do so since it is not clear from the language of the Customer Choice Law or the ICC's rationale that such a distinction should be made here.

Petitioners also complain of several other rules that they claim are arbitrary and capricious. Section 450.60 requires utilities to provide to unaffiliated ARES the same distribution and transmission information that the utility has provided to its affiliated interests. 83 Ill. Adm.

Code § 450.60 (eff. November 7, 1998). Section 450.100 requires that utilities function separately from their affiliated ARES. 83 Ill. Adm. Code § 450.100 (eff. November 7, 1998). And finally, section 450.110(a) states that a utility and its affiliated ARES may not share employees unless the employees are in the areas of corporate or emergency support. 83 Ill. Adm. Code § 450.110(a) (eff. November 7, 1998).

We cannot find that any of these rules are arbitrary and capricious. To the contrary, these rules are necessary to accomplish the General Assembly's goal of providing a competitive market for the provision of electric service. Without these rules, utilities would be able to provide their affiliates with competitive advantages that are not available to the unaffiliated ARES, thereby defeating the nondiscrimination between affiliated and unaffiliated ARES that the Customer Choice Law seeks to accomplish.

Finally, petitioners restate their argument about sections 450.130, 450.20(e), 450.20(f), and 450.140(d), which require utilities to compile and make available certain information regarding affiliated and unaffiliated ARES (83 Ill. Adm. Code §§ 450.130, 450.20(e), (f), 450.140(d) (eff. November 7, 1998)). As discussed above, it is more economically feasible for the utilities to make this information available to the ICC, since they are already in possession of the information. We find that these rules are not arbitrary, capricious, or overly burdensome.

## CONCLUSION

For the foregoing reasons, we affirm the order of the ICC adopting final rules to implement section 16—121 of the Electric Service Customer Choice and Rate Relief Law of 1997.

Affirmed.

WELCH and HOPKINS, JJ., concur.