(text box: 1)
 NO. 5-02-0199

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_______________________________________________________________________________________________

HARRISONVILLE TELEPHONE COMPANY, )  Appeal from an Order of the

MOULTRIE INDEPENDENT TELEPHONE )  Illinois Commerce Commission.

COMPANY, LEAF RIVER TELEPHONE ) 

COMPANY, MONTROSE MUTUAL )

TELEPHONE COMPANY, NEW WINDSOR )

TELEPHONE COMPANY, ONEIDA )

TELEPHONE EXCHANGE, VIOLA HOME )

TELEPHONE COMPANY, WOODHULL )

COMMUNITY TELEPHONE COMPANY, )

and ILLINOIS INDEPENDENT TELEPHONE )

ASSOCIATION, )

)

Petitioners, ) 

)

)  Nos. 00-0233 & 00-0335

)          (Consolidated)

ILLINOIS COMMERCE COMMISSION, ) 

) 

Respondent. )

_____________________________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

The petitioners appeal from an original order and from an order on rehearing, both entered by the Illinois Commerce Commission.  The original order was entered on September 18, 2001, and the order on rehearing was entered on March 13, 2002.  At issue in this matter is the establishment of a state universal service fund for small rural telephone companies.

FACTS

Following the restructuring of the telecommunications industry in the 1980s, the federal and state governments enacted legislation designed to keep the playing field level for rural telephone companies and to ensure that telephone service was universally available and affordable.  In keeping with this policy of keeping service available and affordable, various funding sources were established.  Funding was essential to the support of these rural carriers, who often had very high costs in providing service to citizens of the rural setting.  In fact, oftentimes, the costs to provide telephone service in these rural areas exceed the revenue derived from providing those services.  These funds are distributed by both the federal government and the state government.

On May 7, 1997, the Federal Communications Commission (FCC) established a federal universal service fund, providing essential support to small local exchange carriers to assist these companies in meeting a portion of their high costs of providing telephone service to the public in rural areas.  On March 17, 2000, the Illinois Independent Telephone Association filed a petition with the Illinois Commerce Commission (Commission) requesting that Illinois establish its own universal service support fund for rural telephone companies pursuant to a recently passed Illinois statute contemplating its establishment.  Thereafter, the Commission ordered its own investigation.  The dockets were consolidated on May 10, 2000.

On September 18, 2001, the Commission entered an order that established an Illinois universal service fund for the first time.  This universal service fund support is to be provided to companies whose economic costs of doing business of providing the group of services that constitute universal service exceed the affordable rate established by the Commission for the supported service, less any federal monies received for the same provision of service.  A finding in this order established that the aggregate costs of providing services for all access lines in the areas serviced by the rural telephone carriers, after accounting for federal similar support, exceeded a Commission-established affordable rate of $22.23 per month by as much as $73.5 million or as little as $29.9 million.  However, the rural telephone companies were not seeking these economic costs amounts but were seeking funds based upon the appropriate rate of return that each company was entitled to earn.  The amount sought by the rural telephone companies was $12,799,298, with some minor adjustments.  After reviewing all of the evidence presented, the Commission determined that a proposal set forth by Verizon North, Inc., and Verizon South, Inc. (Verizon), best served the competing needs in that it utilized the affordable rate and the economic costs gap in reaching a determination on each company’s funding needs.  Utilizing an affordable rate of $22.23 monthly, suggested by Verizon, would reduce the subsidy amount sought by the rural telephone carriers by $6.2 million.  Under this proposal, each rural telephone company would be required to demonstrate the need for funding through the use of the $22.23-per-month affordable rate and the current rate for telephone services that each company charged.  In this order, the Commission also determined that the list of Illinois-supported telephone services should mirror the FCC-supported services list but that it would only consider funding for each primary access phone line–not for every access line in homes and businesses.  It reached this determination by concluding that the “voice grade access to the network” category of lines eligible for federal funding only included a primary residential line and a single business line, stating, “[D]iscretionary services should not be supported by the *** fund.”  The order established an initial universal service fund in the amount of approximately $6.6 million.  

The Illinois Independent Telephone Association, along with other petitioners, filed a timely application for rehearing.  On October 31, 2001, the Commission granted rehearing on four of the issues raised.  Two of the issues involved alleged mathematical errors.  The third issue involved the number of access lines considered.  The fourth issue questioned the Commission’s decision to disallow a phase-in of rate increases or a transition plan to the “affordable rate.”  The order upon rehearing was entered on March 13, 2002.  The Commission corrected its mathematical errors, increased the initial universal service fund size to $8,420,271, and utilized $20.39 monthly as the “affordable rate.”  No change was made to the original conclusion that the access lines considered would not include secondary business and residential lines.  The order on rehearing resolved the final issue by approving a three-to-five-year transition plan based upon the level of an individual company’s existing rates.  That determination meant that initial fund size would be $10,535,634, and the final fund size at the conclusion of the transition would be $8,695,055.

The Illinois Independent Telephone Association appeals from this March 13, 2002, order on rehearing.  The Illinois Independent Telephone Association raises the following issues:

1.  The Commission should not have denied universal service fund support for all access lines.

2.  There was no evidence to support the level of funding included in the initial universal service fund.

Additionally, several rural telephone companies
(footnote: 1) raise the following additional concerns on appeal:

1.  The finding that the rural telephone companies are entitled to earn an appropriate rate of return is inconsistent with the reduction of the amount of each company’s funding by the percentage of secondary lines the company serves.

2.  The conclusion that all access lines should not be included in determining funding amounts is in violation of federal law.

3.  The Commission’s order is in violation of an Illinois statute requiring telephone companies to provide advanced telecommunications services to at least 80% of their customers by January 1, 2005.

4.  The affordable rate should not have been set below the current rate.

Harrisonville Telephone Company (Harrisonville) separately appeals and raises the following issues:

1.  The Commission’s adoption of Verizon’s average rate as the “affordable rate” was not supported by substantial evidence.

2.  The interpretation of “economic costs” as being synonymous with “forward looking” costs was erroneous.

3.  The Commission’s denial of Harrisonville’s interlocutory appeal of an evidentiary matter was erroneous.

Finally, Moultrie Independent Telephone Company (Moultrie) filed a separate appeal of Commission rulings regarding sale and lease transactions undertaken by Moultrie and the impact those transactions and Moultrie’s business structure had upon the method of determining the funding to which Moultrie was entitled.

STANDARD OF REVIEW

Because the Commission is an administrative agency, the judicial review of its orders is somewhat limited.  
Illinois Power Co. v. Illinois Commerce Comm’n
, 316 Ill. App. 3d 254, 258, 736 N.E.2d 196, 200 (2000).  On appeal, a court should only reverse such an administrative order if it reaches one of the following conclusions:

1.  The Commission’s findings are not supported by substantial evidence in the record.

2.  The Commission acted beyond its authority.

3.  The order violates a state or federal statute or constitution.

4.  The proceedings were in violation of the state or federal constitution or laws to the petitioner’s prejudice.

Illinois Bell Telephone Co. v. Illinois Commerce Comm’n
, 203 Ill. App. 3d 424, 433, 561 N.E.2d 426, 433 (1990).

Because of the agency’s familiarity with its own statutes and regulations, the Commission’s statutory interpretation would normally be granted extreme deference on appellate review.  
Local Union Nos. 15, 51, & 702, International Brotherhood of Electrical Workers v. Illinois Commerce Comm’n
, 331 Ill. App. 3d 607, 613-14, 772 N.E.2d 340, 345 (2002).
  However, we are not necessarily bound by its statutory interpretation.  
Archer-Daniels-Midland Co. v. Illinois Commerce Comm’n
, 184 Ill. 2d 391, 397, 704 N.E.2d 387, 390 (1998).  If the Commission fails to abide by its own rules and standards, then its order relative to that particular issue can be reviewed
 de novo
.  
Illinois Bell Telephone Co. v. Illinois Commerce Comm’n
, 327 Ill. App. 3d 768, 775, 762 N.E.2d 1117, 1122 (2002).

ANALYSIS

Background

The Public Utilities Act (220 ILCS 5/1-101 
et seq.
 (West 2000)) provides for the general supervision of all public utilities by a statutorily created commission, the Illinois Commerce Commission.  220 ILCS 5/2-101, 4-101 (West 2000).  The power and authority of the Commission comes strictly from this statutory enactment, and the Commission cannot by its own actions extend its jurisdiction.  
Regional Transportation Authority v. Illinois Commerce Comm’n
, 118 Ill. App. 3d 685, 694, 455 N.E.2d 172, 178 (1983).  Furthermore, the Commission can only determine facts and enact orders concerning the matters specified in the Public Utilities Act.  
Lowden v. Illinois Commerce Comm’n
, 376 Ill. 225, 230, 33 N.E.2d 430, 433-34 (1941).  Telephone companies are, by definition, “public utilities.”  220 ILCS 5/3-105, 13-101 (West 2000).  

On May 7, 1997, the FCC established a federal universal service fund to partially fund the expenses of small rural telephone companies.
(footnote: 2)  47 C.F.R. §§54, 36 (1998).  Because only a portion of a rural company's costs was covered by the federal universal service fund, the State of Illinois enacted similar legislation.  The Illinois legislature amended section 13-301 of the Public Utilities Act, effective August 20, 1999, to authorize the Commission to investigate the necessity for an establishment of one or more Illinois universal service funds to provide additional support for rural telephone companies.  220 ILCS 5/13-301 (West Supp. 1999).  The federal and state funds cannot be duplicated, in that any Illinois-authorized support must be reduced by the amount of federal funds each telephone company receives.  220 ILCS 5/13-301(d) (West Supp. 1999).  The source of these Illinois funds is “all local exchange and interexchange telecommunications carriers certificated in Illinois on a competitively neutral and nondiscriminatory basis.”  220 ILCS 5/13-301(d) (West Supp. 1999).  In essence, the source of the funds is each company’s customer base, with each telephone company billing its customers.  

Section 13-301(d) of the Public Utilities Act directs the Commission to:

“investigate the necessity of and, if appropriate, establish a universal service support fund from which local exchange telecommunications carriers who pursuant to the [previous Commission order] received funding and whose economic costs of providing services for which universal service support may be made available exceed the affordable rate established by the Commission for such services may be eligible to receive support, less any federal universal service support received for the same or similar costs of providing the supported services; provided, however, that if a universal service support fund is established, the Commission shall require that all costs of the fund be recovered from all local exchange and interexchange telecommunications carriers certificated in Illinois on a competitively neutral and nondiscriminatory basis.  In establishing any such universal service support fund, the Commission shall, in addition to the determination of costs for supported services, consider and make findings pursuant to [other paragraphs of this section].”  220 ILCS 5/13-301(d) (West Supp. 1999).

The question of which phone lines are eligible for that funding depends upon interpretation, but it is a matter to be determined by the Commission.  220 ILCS 5/13-301(e)(1) (West Supp. 1999).  Section 13-301(e)(1) of the Public Utilities Act provides that the list of supported telecommunications services should, at a minimum, include those services defined by the FCC.  The FCC has identified the following services as being eligible for support:

1.  voice grade access to the public switched network

2.  local usage

3.  dual tone multifrequency signaling or its equivalent

4.  single-party service or its functional equivalent

5.  access to emergency services

6.  access to operator services

7.  access to interexchange service

8.  access to directory assistance

9.  toll control services for qualifying low-income consumers

47 C.F.R. §54.101 (1998).  The FCC further defines the term “voice grade access” as “a functionality that enables a user of telecommunications services to transmit voice communications, including signalling the network that the caller wishes to place a call, and to receive voice communications, including receiving a signal indicating there is an incoming call.”  47 C.F.R. §54.101(a)(1) (1998).

Jurisdiction

Before we begin analyzing the numerous issues brought to this court on appeal, we must initially address the question of jurisdiction.  The Commission contends that its second interim order was not final and that therefore this court lacks jurisdiction to hear this case.  The Commission suggests that the appellants were required to re-petition for rehearing when the Commission issued its order upon rehearing, because at the second hearing the parties introduced quite a bit of additional evidence.  The Commission only contends that we lack  jurisdiction over the second-lines issue.

Prior to 1986, appeals from rehearings on orders of the Commission were heard by the circuit court “of the county in which the subject-matter of the hearing is situated.”  Ill. Rev. Stat. 1983, ch. 111⅔, par. 72.  Once the case was filed in the circuit court, the case was required to be “heard according to the rules governing other civil cases, so far as the same are applicable.”  Ill. Rev. Stat. 1983, ch. 111⅔, par. 72.  This older version of the Public Utilities Act included a provision by which the Commission only granted one rehearing.  Ill. Rev. Stat. 1983, ch. 111⅔, par. 71.

In 1986, the previous version of the Public Utilities Act was repealed and was replaced with the more current version, which is largely still in effect today.

Section 10-113 of the Public Utilities Act (220 ILCS 5/10-113 (West 2000)) took effect on January 1, 1986.  This section details the procedure for petitions for rehearing and appeals.  The Commission is able, at any time, to rescind, alter, or amend its orders.  220 ILCS 5/10-113(a) (West 2000).  Within 30 days after the service of a Commission order, “any party to the action *** may apply for a rehearing in respect to any matter determined in said action or proceeding and specified in the application for rehearing.”  220 ILCS 5/10-113(a) (West 2000).  The Commission then has 20 days from the date of the receipt in which to decide if it will rehear the case.  Regarding appeals, the rule states as follows:

“No appeal shall be allowed from any *** order *** of the Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission: provided, however, that in case the Commission shall fail to grant or deny an application for a rehearing in whole or in part within 20 days from the date of the receipt thereof, or shall fail to enter a final order upon rehearing within 150 days after such rehearing is granted, the application for rehearing shall be deemed to have been denied and finally disposed of, and an order to that effect shall be deemed to have been served, for the purpose of an appeal from the *** order *** covered by such application.”  220 ILCS 5/10-113(a) (West 2000).

In essence, this statute provides that upon the Commission’s grant of rehearing, the Commission maintains jurisdiction over the case for a total of no more than 150 days.  About rehearings, the statute provides, “Only one rehearing shall be granted by the Commission; but this shall not be construed to prevent any party from filing a petition setting up a new and different state of facts after 2 years[] and invoking the action of the Commission thereon.”  220 ILCS 5/10-113(a) (West 2000).

Also on January 1, 1986, our legislature enacted section 10-201 of the Public Utilities Act (220 ILCS 5/10-201 (West 2000)).  This section more specifically addresses appeals from orders of the Commission.  Within 35 days from that date on which the Commission’s order was served upon the affected party, that party “may appeal to the appellate court of the judicial district in which the subject matter of the hearing is situated[] or[,] if the subject matter of the hearing is situated in more than one district, then of any one of such districts, for the purpose of having the reasonableness or lawfulness of the *** order *** inquired into and determined.”  220 ILCS 5/10-201(a) (West 2000).  With respect to pleadings and the record on appeal, the statute provides, “The appeal shall be heard according to the rules governing other civil cases, so far as the same are applicable.”  220 ILCS 5/10-201(b) (West 2000). 

The major appeal-related change that took place when the new version of the Public Utilities Act took effect on January 1, 1986, is that appeals from Commission orders would no longer be heard in the circuit court.  Those appeals are now heard in the appellate court, and those appeals are now specifically governed by the appellate court procedural rules.  Additionally, the statute specifically governing appeals from Commission orders unequivocally states, “Only one rehearing shall be granted by the Commission[.]”  220 ILCS 5/10-113(a) (West 2000).

Prior to the enactment of this statute, case law established that it was sometimes necessary for a party to seek a second rehearing in situations where the first rehearing resulted in a modification of the original order.  
Alton R.R. Co. v. Illinois Commerce Comm’n
, 407 Ill. 202, 208, 95 N.E.2d 76, 79 (1950); 
City of Edwardsville v. Illinois Commerce Comm’n
, 412 Ill. 34, 37, 104 N.E.2d 283, 284 (1952);
 Scherer Freight Lines, Inc. v. Illinois Commerce Comm’n
, 24 Ill. 2d 359, 364, 181 N.E.2d 134, 137-38 (1962).  Application for a second rehearing was required in situations where additional evidence was adduced following the Commission’s entry of its first order.  
Scherer Freight Lines, Inc.
, 24 Ill. 2d at 364, 181 N.E.2d at 137-38.  In cases where “an order entered after rehearing does not substantially modify the first one and is not based upon any additional evidence, an appeal therefrom may be taken without a second petition for rehearing.”  
Continental Air Transport Co. v. Illinois Commerce Comm’n
, 38 Ill. 2d 563, 566, 232 N.E.2d 728, 729 (1967).

All these cases predate the 1970 Illinois Constitution and the 1986 version of the Public Utilities Act, and therefore, the application of these cases to present-day situations is in dispute.  We must determine whether these new statutes required the filing of a second request for rehearing before this court would be vested with jurisdiction to hear an appeal.

In 1991, the Illinois Supreme Court held that its own rules applied regarding the time in which to file an appeal, instead of statutes which contained a time frame relative to the review of an agency’s decision in the circuit court.  
County of Cook, Cermak Health Services v. Illinois State Local Labor Relations Board
, 144 Ill. 2d 326, 334, 579 N.E.2d 866, 870-71 (1991).  The administrative review statute and legislative statute at issue provided 35 days in which to file in the circuit court a petition for the review of the administrative decision.  Ill. Rev. Stat. 1987, ch. 48, par. 1611(e); Ill. Rev. Stat. 1987, ch. 110, par. 3-101 
et seq.
  Supreme Court Rule 335, in conjunction with Supreme Court Rule 303(a)(1), allowed 30 days in which the petitioner had to file his request for appellate court review of the administrative decision.  107 Ill. 2d Rs. 335, 303(a)(1).  The supreme court stopped short of labeling the different time frames as being a “conflict,” referring to the difference as “tension.”  
County of Cook, Cermak Health Services
, 144 Ill. 2d at 332, 579 N.E.2d at 869.  Discrepancies between procedural rules of the supreme court and procedural statutory provisions are resolved through the Illinois Constitution.  
County of Cook, Cermak Health Services
, 144 Ill. 2d at 332, 579 N.E.2d at 869-70.  The constitution provides that the appellate court “shall have such powers of direct review of administrative action as provided by law.”  Ill. Const. 1970, art. VI, §6.  This constitutional provision allows the legislature to enact statutes providing for such direct review in the appellate court.  
County of Cook, Cermak Health Services
, 144 Ill. 2d at 333-34, 579 N.E.2d at 870.  While the supreme court and the legislature have concurrent constitutional authority to enact rules regarding direct appellate court review of administrative decisions, discrepancies between the rules and the statutes must be resolved within the fabric of our constitution.  
County of Cook, Cermak Health Services
, 144 Ill. 2d at 334, 579 N.E.2d at 870.  Because the legislature had not specifically included within the statute at issue there a time frame for direct appeals of administrative decisions to the appellate court, the supreme court concluded that its rule governed the time frame.  
County of Cook, Cermak Health Services
, 144 Ill. 2d at 334, 579 N.E.2d at 870-71. 

The supreme court’s opinion in 
County of Cook, Cermak Health Services v. Illinois State Local Labor Relations Board
 approved this court’s earlier decision of 
Consumers Gas Co. v. Illinois Commerce Comm’n
, 144 Ill. App. 3d 229, 493 N.E.2d 1148 (1986).  
County of Cook, Cermak Health Services
, 144 Ill. 2d at 338, 579 N.E.2d at 872.  In 
Consumers Gas Co. v. Illinois Commerce Comm’n
, we addressed a conflict between language contained within the Public Utilities Act and the supreme court rules regarding obtaining a stay of judgment pending the outcome of an appeal and the jurisdictional problems the conflict created.  Under section 10-201 of the Public Utilities Act, we noted that a petitioner had 30 days in which to get a notice of appeal filed in this court.  
Consumers Gas Co.
, 144 Ill. App. 3d at 234-35, 493 N.E.2d at 1151.  According to that statute, we concluded that the appellate court had not obtained jurisdiction over the matter until the appellants filed a notice of appeal with the secretary of the Commission.  
Consumers Gas Co.
, 144 Ill. App. 3d at 235, 493 N.E.2d at 1151.  We noted and concluded that the requirement of service only upon the appellate court clerk was in direct contravention of Supreme Court Rule 335, which required service upon the Commission and all other parties of record.  
Consumers Gas Co.
, 144 Ill. App. 3d at 235, 493 N.E.2d at 1151.  Utilizing the doctrine of separation of powers, we explained that the legislative branch could not exercise its powers by enacting a statute that attempted to regulate judicial procedures.  
Consumers Gas Co.
, 144 Ill. App. 3d at 235-36, 493 N.E.2d at 1152.  We concluded that to the extent that portions of section 10-201 of the Public Utilities Act conflicted with Supreme Court Rule 335, those portions were unconstitutional.  
Consumers Gas Co.
, 144 Ill. App. 3d at 236, 493 N.E.2d at 1152.

The foundation for the Commission’s claimed requirement of seeking a rehearing on an order of rehearing is not found within the Public Utilities Act, which clearly only contemplates one rehearing.  That foundation is found in case law enacted before the 1970 Illinois Constitution, before the enactment of the present version of the Public Utilities Act, and before the enactment of Supreme Court Rule 335.

Our 1970 constitution explicitly provided that the appellate court maintains powers of direct review of administrative actions.  Ill. Const. 1970, art. VI, §6.  In 1971, the supreme court enacted Rule 335 to that effect, which sets forth the manner and method of appealing an administrative order to the appellate court.  Since January 1, 1986, section 10-201(a) of the Public Utilities Act has provided for appellate court review of the Commission’s decision following rehearing.  220 ILCS 5/10-201(a) (West 2000).  To the extent that there are conflicts between the Public Utilities Act and the supreme court rules, those conflicts are resolved in favor of the supreme court rules.  See 
County of Cook, Cermak Health Services
, 144 Ill. 2d 326, 579 N.E.2d 866; 
Consumers Gas Co.
, 144 Ill. App. 3d 229, 493 N.E.2d 1148.  

Nothing in the Public Utilities Act, or the related administrative regulations, requires parties before the Commission to seek rehearing on an order on rehearing.  Without determining whether or not this particular case involved the introduction of additional evidence or whether the order on rehearing substantially modified the initial order, we conclude that it was not necessary for the petitioners to have sought a second rehearing before the Commission.  We do not base our decision upon a conflict between statutes and the supreme court rules, but in effect our decision involves the resolution of a conflict.  That conflict is between the old case law and our current supreme court rules.  The case law requiring second rehearings is no longer relevant in light of the amendment of our state’s constitution, as well as the enactment of both Supreme Court Rule 335 and the new version of the Public Utilities Act.  Since January 1, 1986, appeals of administrative decisions are directed to the appellate court.  By way of Supreme Court Rule 335(i), other supreme court rules govern these appeals.  155 Ill. 2d R. 335(i).  After resolution of the petition for rehearing, the matter became appealable to this court.  155 Ill. 2d Rs. 301, 303(a)(2).  No further action before the Commission was required.

Access Lines

We first address the matter of the inclusion of all telephone lines in determining universal service fund support.  In reaching its decision that it would only include residential primary telephone lines in counting the number of access lines eligible for support, the Commission essentially expressed its belief that the federal government had not intended for business or secondary residential lines to be included.  We do not find the federal government’s list of services eligible for support to be so restrictive.

Simply stated, universal support means universal support.  More specifically, the FCC identified “voice grade access to the public switched network” as a service eligible for support.  The Commission determined that the Illinois-supported access line list should mirror that of the FCC.  We agree.  As earlier stated, the FCC has defined “voice grade access” as “a functionality that enables a user of telecommunications services to transmit voice communications, including signalling the network that the caller wishes to place a call, and to receive voice communications, including receiving a signal indicating there is an incoming call.”  47 C.F.R. §54.101(a)(1) (1998).  Basically, this definition is referencing the basic telephone line–a line capable of receiving and transmitting voice communications.  This definition does not restrict its meaning to only primary residential lines.  Business lines are certainly capable of receiving and transmitting voice communications.  Even business and residential lines that are utilized for more modern conveniences, such as facsimile machines and computer Internet access, remain phone lines capable of receiving and transmitting voice communications.  We return to our original comment–universal means universal. To the extent that the Commission was concerned that urban residents should not be required to pay for “discretionary services” enjoyed by their rural counterparts, we ask, Why should access to phone lines–even “discretionary” phone lines–cost much more in a rural setting than in an urban setting?  Furthermore, the assumption that all “secondary” lines are “discretionary” lines dismisses entities like schools and public libraries, which require affordable access on all of their lines.  The point of providing universal fund support service is to level the playing field.  Theoretically, lower prices, competitive with what is offered in urban settings, will allow greater access to telephonic services.  Our state and federal governments have established this greater access as a worthy goal.  These extra access lines, whether or not they can all be labeled “discretionary,” should not be inordinately more expensive than identical services in an urban setting.  We find no legal justification for limiting the number of access lines eligible for this support.  On this basis, the orders of the Commission must be reversed.

Additionally, that portion of the Commission’s orders reducing the amount of funding by the percentage of secondary lines must also be reversed.

These reversals are retroactive to the date of the March 13, 2002, Commission order on rehearing.

Affordable Rate

Initially, the Commission based its affordable-rate ruling of $22.23 monthly on a rate proposed by Verizon as the amount Verizon charged its substantial rural telephone customer base.  Due to a mathematical error, on rehearing, the Commission settled upon an affordable rate of $20.39 per month.

The term “affordable rate” is not defined.  The national urban average telephone rate is around $14 per month.  The Illinois Independent Telephone Association, Harrisonville, and other rural telephone companies suggested that the Commission should adopt the existing rates, which were different for every telephone company.  The range of these “existing rates” was from $4 per month to $31.20 per month.  The Commission staff suggested a residential rate of $24 and a business rate of $27.  MCI WorldCom suggested a rate of $23.70.  Verizon suggested a rate of $22.23.  Each of the companies suggesting an affordable rate to the Commission did so by way of either complex calculations or rather simple calculations.  In other words, each company provided a foundation for its suggestion.

Basically, Harrisonville and the other appealing rural telephone companies argue that our state legislature has provided that the affordable rate cannot be lower than the rates in effect at the time that the Commission creates a universal service support fund.  The Commission responds that the affordable rate must be set by the Commission and that the legislature did not state that the Commission must utilize the existing rates.  Furthermore, section 13-301(e)(4) of the Public Utilities Act further provides that the Commission is specifically authorized to use indices or models to “update” the affordable rate from the existing rates.  220 ILCS 5/13-301(e)(4) (West 2000).  The Commission responds that this allowable “update” procedure contemplates the setting of an affordable rate at an amount different from the existing rates.

In reaching its decision on this issue, the Commission heard testimony and received arguments from numerous interested parties.  Testimony of more than one expert witness about the affordable rate was found to be arbitrarily based.  Overall, the Commission noted, “The establishment of an affordable rate is a determination that must carefully balance the interests of those receiving [universal service funding] subsidies with those that will pay for [universal service funding] subsidies.”  Setting an affordable rate above that of existing rates is allowed so long as the record supports such a conclusion. 

The Commission noted that the FCC had empowered it to examine demographic and social factors, in addition to the size of local calling areas, when it was determining an affordable rate.  The rural telephone company intervenors failed to suggest any possible demographic combination that would support utilization of the existing rates.  Using the existing rates would result in vastly different amounts being charged across the state and vastly different funding distributed across the state.  The Commission concluded that the rural telephone companies had not “presented any evidence with respect to income, demographics[,] or size of local calling areas to explain why affordable rates should differ by company.”  Furthermore, the Commission noted that if it adopted an existing-rates approach, that approach would result in subscribers of rural telephone companies receiving favorable treatment over Verizon’s rural subscribers.  That favorable treatment would be in the form of subsidies that Verizon’s similarly situated rural customers would not receive.  Additionally, not applying an across-the-board affordable rate would favor some rural telephone companies over others.

One argument for setting a low affordable rate was that Illinois’s penetration rate (based upon the number of consumers with telephone lines) was low and setting a low rate might affirmatively impact these numbers.  With respect to penetration rates, the Commission heard much empirical evidence that conclusively demonstrated that even substantially increasing residential rates would only minimally impact Illinois’s rather dismal penetration rate.  No one provided evidence to the contrary.  Additionally, there was no evidence to suggest that the penetration rate decline was the result of the loss of rural (as opposed to urban) telephone company customers.

Another argument advanced by the rural telephone companies is that the affordable rate was artificially low because it did not include the extra surcharges tacked onto every customer’s monthly bill.  That amount is approximately $7.56 per month, related to federal subscriber line charges, federal, state, and local telecommunications taxes, and other mandatory additional charges.  Expert witnesses on behalf of the rural telephone companies testified that the actual amount billed to customers is the amount that should be considered in fixing an affordable rate, because it best reflects the impact upon customers.  The Commission noted that all phone company customers pay additional surcharges, and it concluded that this argument was irrelevant and immaterial, because these surcharges were taken into consideration in reaching its decision on an affordable rate.

The Commission was given the rather difficult task of determining an affordable rate relative to the universal service support fund.  After receiving large amounts of evidence and hearing testimony and arguments of all interested parties, the Commission concluded that the best approach was to enact one affordable rate.  Setting one rate was within the Commission’s legislative power.  We are not prepared to state that the Commission’s determination is not supported by substantial evidence in the record or was an action beyond the Commission’s authority.

[Nnonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) omitted here.]

Moultrie Independent Telephone Company

Moultrie services 853 access lines in rural central Illinois.  Moultrie sold certain nonnetwork assets, including buildings, work equipment, and vehicles, to an unregulated affiliate.  Following the sale, since Moultrie’s business still required the items sold, it leased those items back from its affiliate up to the level of its usage.  In other words, if it only needed a portion of a building for its business, it only leased that portion, rather than leasing the entire building.  Moultrie did this reorganization for the purpose of increasing its profitability or, more specifically, to “improve [Moultrie’s] financial integrity and competitive position while allowing [Moultrie] to continue providing high-quality service to its rural customers.”  Moultrie sought and received approval from the Commission for this reorganization.

Moultrie is eligible for both federal and state funding.  The reorganization had an effect on Moultrie’s books.  The old costs of the sold assets were removed from the investment portion of Moultrie’s accounts, and the lease expenses were included as operational expenses.  The federal government did not care for the accounting measures taken to reflect the sale and leaseback of assets and would, therefore, only utilize prereorganization figures in calculating the amount of funding to which Moultrie was entitled.  Moultrie filed a petition for a declaratory ruling against the federal corporation created by the FCC, the National Exchange Carrier Association (NECA), regarding its refusal to use current figures.  A federal court of appeals has reviewed and denied Moultrie’s petition.  
Moultrie Independent Telephone Co. v. Federal Communications Comm’n
, 56 Fed. Appx. 518 (2003) (unpublished judgment).  The same situation occurred in the Illinois setting.  A Commission witness assigned to review Moultrie’s Illinois universal service fund calculation removed the lease payment from the expense category and reinstated the assets’ value in the investment portion of Moultrie’s “balance sheet.”  The Commission adopted this approach in its orders.

The effect of making the assets an expense rather than an investment is to increase the amount of funding to which Moultrie would be entitled.  The Commission stated that to include the lease expenses in the expenses category would “improperly impact[] the [rate-of-return] study by inflating items of expense (recovered dollar for dollar) and deflating rate base (recovered on a percentage basis).”

Moultrie asks this court to reverse the orders of the Commission on this issue, raising several arguments.

[Nonpublishable material under Supreme Court Rule 23 omitted here.]

Asset Ownership

The resolution of this issue is simple.  The Commission did not order Moultrie to retake possession of these assets and did not otherwise void the sale.  The Commission is not saying that Moultrie’s reorganization should not have been allowed.  It is merely stating that because of the manner in which it inflates its expenses, it would unfairly authorize Moultrie’s receipt of increased funding.  Selling and leasing back equipment in order to increase a company’s profitability is acceptable, but Moultrie cannot expect to receive additional funding, because Moultrie’s numbers “on the books” are enhanced by this in-house transaction.  Would the situation be different if Moultrie’s affiliate did not control the leaseback terms?  We cannot know for certain, but the fact that Moultrie’s expenses are being paid by one hand and accepted by another hand could have been a factor in the federal and state government positions.

The result is that, contrary to Moultrie’s position, the Commission did not require it to own its own facilities.  On that basis, we cannot find fault in the Commission’s decision.

Application of Unadopted Federal Regulations

Moultrie contends that the Commission improperly utilized NECA’s interpretation of federal regulations in reaching its decision.  The Commission denies this assertion, pointing to its own statements in its order: “[T]he actions of NECA are not binding upon the Commission and were not relied upon in reaching the determination here, which is based solely upon our authority to establish and size a [universal service fund] under state statute.”  Moultrie points to a different part of the Commission’s decision, in which the Commission explained how it reached its decision:

“[Moultrie] has *** severely compromised its right to receive federal support as a result of the sale-leaseback transaction.  Quite simply, NECA believes that [Moultrie] is violating federal rules by accounting for the transaction in the manner it has, and [NECA] has withheld a substantial portion of [Moultrie’s] federal support.  ***  To the extent that this results in a revenue shortfall, [Moultrie] will, presumably, increase its rates to an unaffordable level[] or seek an increased level of intrastate support.  Neither of these outcomes is acceptable; neither [Moultrie’s] ratepayers nor Illinois ratepayers in general should be compelled to make good a deficiency which would not exist but for [Moultrie’s] non[]substantive actions.”

Moultrie contends that this language proves that the Commission relied upon NECA’s interpretation of federal rules and regulations.  Moultrie has no other proof.  

Determining reasonable costs and revenue deficits in settling upon appropriate universal service fund support is completely within the Commission’s jurisdiction.  220 ILCS 5/13-301(d) (West 2000).  Transactions between affiliated interests must be specially scrutinized by the Commission.  220 ILCS 5/7-101(3) (West 2000).  Transactions between a public utility and its affiliated companies can easily lead to unjust and unreasonable rates by cost manipulation.  See 
Estate of Besinger v. Village of Carpentersville
, 258 Ill. App. 3d 218, 225, 630 N.E.2d 178, 183 (1994); 
Peoples Energy Corp. v. Illinois Commerce Comm’n
, 142 Ill. App. 3d 917, 929, 492 N.E.2d 551, 561 (1986).  The Commission is required to analyze the transaction and is not required to merely accept the accounting practices of the utility appearing before it.  See 
United Cities Gas Co. v. Illinois Commerce Comm’n
, 163 Ill. 2d 1, 23-25, 643 N.E.2d 719, 730-31 (1994); 
Metro Utility Co. v. Illinois Commerce Comm’n
, 262 Ill. App. 3d 266, 276-78, 634 N.E.2d 377, 383-85 (1994).

In a 59-page order, this one reference to what NECA found does not support Moultrie’s contention that the Commission based its decision upon what NECA had already done.  On this basis, we cannot conclude that the Commission exceeded its authority.

Utilizing Only Used and Useful Property in the Rate Base

Moultrie contends that the Commission failed to utilize a basic utility rate regulation principle.  The Commission must determine that a facility is “prudent as well as used and useful in providing utility service to the utility’s customers.”  
Business & Professional People for the Public Interest v. Illinois Commerce Comm’n
, 146 Ill. 2d 175, 196, 585 N.E.2d 1032, 1039 (1991).

The Commission does not substantively respond to this argument, instead stating that the issue is waived because Moultrie failed to raise the issue initially before the Commission–a prerequisite for appeal to the appellate court.  

“No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission.”  220 ILCS 5/10-113(a) (West 2000); 
Citizens Utility Board v. Illinois Commerce Comm’n
, 166 Ill. 2d 111, 134-36, 651 N.E.2d 1089, 1101 (1995); 
City of Granite City v. Illinois Commerce Comm’n
, 407 Ill. 245, 250, 95 N.E.2d 371, 374 (1950).  Specific utility issues cannot be preserved by implication in an application for rehearing.  
Citizens Utility Board
, 166 Ill. 2d at 135-36, 651 N.E.2d at 1101.

A careful review of the issues included in Moultrie’s application for rehearing and of the issues raised in Moultrie’s appeal reveals that this “used and useful” argument is raised for the first time on appeal.  In reply, Moultrie acknowledges that it did not raise this argument in its request for a rehearing before the Commission.  In a rather circular manner, Moultrie argues that it did not need to raise the argument on rehearing because the Commission was required to consider whether its property is “used and useful.”  Furthermore, Moultrie argues that this issue is a legal one and thus properly before this court, because we are to determine whether the Commission complied with Illinois laws and regulations.

This particular issue is quite specific.  Moultrie did not raise it in its request for rehearing before the Commission.  Moultrie’s late decision to raise this issue on this appeal, and its argument that it is a legal issue only to be decided by this court, is not enough to save the issue.  The Commission was not provided the opportunity to reconsider its order on this very specific basis, and thus Moultrie has waived the issue.

Substitution of Commission’s Judgment for Judgment of Moultrie’s Management

Moultrie argues that its decision to reorganize its assets was sound.  We do not doubt that it was a sound business decision.  As we stated in response to the first issue Moultrie raised on appeal, Moultrie cannot expect to receive additional funding because Moultrie’s numbers “on the books” are enhanced by this in-house transaction.  At issue is state funding.  This state funding is achieved by charging every telephone user in the state a specified monthly amount.  While it is perfectly acceptable for Moultrie to change its accounting practices, the transaction necessarily draws scrutiny when Moultrie’s costs of transacting business increase dramatically because of the new lease costs.  That resulting rise in costs translates into an increased funding need.  Because Moultrie still owns the assets, albeit through an affiliated company, requests for increased funding are most certainly going to be matters of concern for the Commission.  We do not consider the Commission’s actions to be actions in substitution for Moultrie’s management.  Again, the Commission is not mandating that Moultrie buy back its own assets from itself.  The Commission simply chose not to follow the accounting methods Moultrie utilized.  That was within the Commission’s power to do.

Sufficiency of the Evidence

Moultrie contends that the Commission’s conclusions on this issue are unsupported by evidence.  The Commission clearly contends that its decision on the issue of the sale and leaseback of assets was based upon the evidence with which it was presented, including the testimony of its employee, Thomas Q. Smith.

“The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission[.]”  220 ILCS 5/10-201(d) (West 2000).  “[T]he burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such *** orders ***.”  220 ILCS 5/10-201(d) (West 2000).  To reverse the Commission’s order, Moultrie must demonstrate that the opposite conclusion is clearly evident.  
Illinois Bell Telephone Co. v. Illinois Commerce Comm’n
, 282 Ill. App. 3d 672, 678, 669 N.E.2d 628, 632 (1996); 
Continental Mobile Telephone Co. v. Illinois Commerce Comm’n
, 269 Ill. App. 3d 161, 171, 645 N.E.2d 516, 523 (1994).

Reviewing the record and the portions of the order at issue, we note that Moultrie’s expert witness made claims that the leaseback transaction saved money.  However, no cost data seemed to be introduced to back up his claim.  Thereafter, this expert admitted that he did not know how this asset transfer affected the revenue requirement being determined in this case.  There was no evidence that the leaseback benefited Moultrie’s customers.  The Commission’s witness established that Moultrie’s customers were annually being assessed more than $250,000 more in operating costs than if the transfer had never occurred.

The testimony of Moultrie’s expert witness and the arguments in Moultrie’s briefs on appeal fail to establish that the Commission’s decision was unsupported by evidence.

CONCLUSION

For the foregoing reasons, the decisions of the Illinois Commerce Commission are affirmed in part and reversed in part.  We remand this case for further proceedings relative to the inclusion of all access lines in the funding amounts.

Affirmed in part and reversed in part; cause remanded.

HOPKINS, P.J., and CHAPMAN, J., concur.

FOOTNOTES
1:
Those rural telephone companies are Leaf River Telephone Company, New Windsor Telephone Company, Montrose Mutual Telephone Company, Oneida Telephone Exchange, Viola Home Telephone Company, and Woodhull Community Telephone Company.

2:
A “rural telephone company” is defined as “a local exchange carrier operating entity to the extent that such entity–

(A) provides common carrier service to any local exchange carrier study area that does not include either–

(i) any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the Census; or

(ii) any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993;

(B) provides telephone exchange service, including exchange access, to fewer than 50,000 access lines;

(C) provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or

(D) has less than 15 percent of its access lines in communities of more than 50,000 on February 8, 1996.”  47 U.S.C. §153 (2000).

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 09/11/03.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.