(No. 97172.

HARRISONVILLE TELEPHONE COMPANY *et al.*,
Appellees, v. THE ILLINOIS COMMERCE COM-
MISSION, Appellant.

*Opinion filed September 23, 2004.*

James E. Weging, Special Assistant Attorney General, of Chicago, for appellant.

Dennis K. Muncy, Joseph D. Murphy and Rebecca E.P. Wade, of Meyer Capel, of Champaign, for appellee Illinois Independent Telephone Association.

Gary L. Smith, of Loewenstein, Hagen & Smith, P.C., of Springfield, for appellees Leaf River Telephone Company *et al.*

JUSTICE FITZGERALD delivered the opinion of the court:

The Illinois Commerce Commission (ICC) appeals the decision of the appellate court in favor of the Illinois Independent Telephone Association and six rural telephone companies or local exchange carriers (LECs).[1] The

---

[1] The six LECs before us in this case are Leaf River Telephone Company, Montrose Mutual Telephone Company, New Windsor Telephone Company, Oneida Telephone Exchange, Viola Home Telephone Company, and Woodhull Telephone Company. We will refer to the appellees here collectively as the LECs.

central issue here is what the Illinois General Assembly meant when it ordered the ICC to establish a "universal service support fund" (USF) in section 13—301(d) of the Public Utilities Act (220 ILCS 5/13—301(d) (West 2002)). Did the legislature intend for the fund to support all rural telephone lines, or only a single line for each residence or business? We agree with the appellate court that universal means universal and that the legislature intended the fund to support all lines. We affirm.

## BACKGROUND

In 1997, the Federal Communications Commission (FCC) established a federal universal service fund (USF) to help rural telephone companies defray the high costs of providing public telephone service to sparsely populated areas. Because the federal USF covered only part of these costs, the General Assembly amended section 13—301(d) of the Public Utilities Act in 1999, ordering the ICC to investigate and, if need be, establish a state USF. 220 ILCS 5/13—301(d) (West 2002). The source of the state USF would be "all local exchange and interexchange telecommunications carriers certificated in Illinois on a competitively neutral and nondiscriminatory basis." 220 ILCS 5/13—301(d) (West 2002). In short, the fund would be repaid by telephone customers throughout Illinois in surcharges tacked onto their telephone bills. The General Assembly further instructed the ICC to define which telecommunications services constitute "universal service," noting that the state definition should be at least as broad as the federal definition promulgated by the FCC. 220 ILCS 5/13—301(e)(1) (West 2002). The FCC has listed nine "services designated for support," including "voice grade access to the public switched network." 47 C.F.R. § 54.101(a)(1) (1998).

In 2001, the ICC decided to establish a state USF and concluded that the Illinois list of supported services

should mirror the FCC list of supported services. Contrary to the position advocated by its staff, however, the ICC found:

"With respect to the element of the 'voice grade access to the network,' *** it shall be limited to a primary residence line and a single business line. The basis for this conclusion is that discretionary services would not be supported by the section 13—301(d) fund. As Ameritech Illinois appropriately argues, to do otherwise might create the unintended result of low-income end user customers in one area of the state subsidizing discretionary services of high-income end user customers in another area of the state whose service is supported by the fund."

The LECs petitioned for, and the ICC granted, rehearing on four issues: two issues concerning alleged mathematical errors in determining the size of the USF and the monthly affordable rate for each rural telephone customer, one issue concerning a transition plan to reach the affordable rate, and one issue concerning the services supported by the USF. In its order on rehearing, the ICC corrected its mathematical errors and approved a transition plan. But, again contrary to the position advocated by its staff, the ICC refused to alter its decision that the state USF would support only primary or single residential and business lines:

"At the time we reached the single line determination ***, we were cognizant of the fact that basing the size of the USF fund on support for a single line would reduce the fund size. We were also cognizant of the fact that the qualifying companies would, in all likelihood, seek to recoup the reduction in the fund size from their customers.

Despite the fact that our decision here may bring rate increases to the customers of the qualifying companies, the policy issue is more far reaching. The policy issue facing the Commission is whether the families and agencies, and, in the case of public agencies, the taxing agencies that support them, should bear the brunt of increased rates relating to second lines, or whether the burden should be shifted to all citizens of the state, including low income citizens in

our inner cities that cannot afford a single line. On balance, reasoned public policy supports imposing the burden on the parties who use the services and the localities where they are used rather than allowing parties to purchase second lines on the backs of the poor."

According to the ICC, section 13—301(d) did not indicate that the General Assembly intended the ICC to "walk in lock step with the FCC in determining whether or not to support all access lines in the USF." The ICC asserted that the statute simply indicated that the Illinois list of supported services should be no smaller than the federal list of supported services. The ICC insisted that it had done just that:

"The fact that the FCC computes the level of support based upon support for all access lines does not change the fact that our order supports the same services. There is no indication anywhere in section 13—301 that the number of lines entitled to support may not be limited, as long as individuals and businesses are guaranteed access to the network and that the fund recognize that access is at an affordable rate."

The ICC ordered that "[t]he services defined by the FCC as supported services shall be the state supported universal services for purposes of the Fund, *with the exception that* the fund shall be based upon support for a single residential or business line." (Emphasis added.) The LECs appealed.

On May 23, 2003, the appellate court filed an opinion, and the LECs filed a petition for clarification under Supreme Court Rule 367. See 155 Ill. 2d R. 367. On September 11, 2003, the appellate court denied that petition, but vacated its earlier opinion and filed a new one. The appellate court affirmed the ICC on several issues, but reversed the ICC on the primary lines issue. The appellate court stated:

"In reaching its decision that it would only include residential primary telephone lines in counting the number of access lines eligible for support, the Commission es-

sentially expressed its belief that the federal government had not intended for business or secondary residential lines to be included. We do not find the federal government's list of services eligible for support to be so restrictive.

Simply stated, universal support means universal support. More specifically, the FCC identified 'voice grade access to the public switched network' as a service eligible for support. The Commission determined that the Illinois-supported access line list should mirror that of the FCC. We agree." 343 Ill. App. 3d 517, 530.

The appellate court noted that the FCC's definition of "voice grade access" refers to a "basic telephone line" that allows a person to place and accept calls; this definition contains no primary lines limitation. 343 Ill. App. 3d at 530-31.

The appellate court continued:

"To the extent that the Commission was concerned that urban residents should not be required to pay for 'discretionary services' enjoyed by their rural counterparts, we ask, Why should access to phone lines—even 'discretionary' phone lines—cost much more in a rural setting than in an urban setting? Furthermore, the assumption that all 'secondary' lines are 'discretionary' lines dismisses entities like schools and public libraries, which require affordable access on all their lines. The point of providing universal fund support service is to level the playing field. Theoretically, lower prices, competitive with what is offered in urban settings, will allow greater access to telephonic services. Our state and federal governments have established this greater access as a worthy goal. These extra access lines, whether or not they can be labeled 'discretionary,' should not be inordinately more expensive than identical services in an urban setting. We find no legal justification for limiting the number of access lines eligible for this support." 343 Ill. App. 3d at 531.

The appellate court also reversed the ICC's order reducing the amount of the state USF by the percentage of multiple lines and made its decision retroactive to March 13, 2002, the date of the ICC's order on rehearing. 343

Ill. App. 3d at 531. We granted the ICC's petition for leave to appeal. 177 Ill. 2d R. 315(a).

## ANALYSIS

In this appeal, the ICC raises four issues: (1) whether the appellate court erred in deciding that the LECs need not file second rehearing petitions after the ICC granted in part and denied in part their first rehearing petitions; (2) whether the appellate court erred in reviewing *de novo* the ICC's decision to limit the state USF to primary residential and business lines; (3) whether the appellate court erred in rejecting the ICC's primary lines limitation and instead deciding the legislature intended the USF to support all lines; and (4) whether the appellate court erred in making its decision retroactive. We address these issues in turn.

### The Second Rehearing Petition Requirement

The ICC argues that the appellate court undermined case law from this court requiring a putative appellant to file a second rehearing petition in order to preserve an issue on appeal where the ICC has granted rehearing and considered additional evidence.[2] The LECs respond that, as the appellate court noted, these cases predate the 1986 amendments to the Public Utility Act and consequently no longer control. According to the LECs, an ICC order is final and appealable after the Commission has decided a putative appellant's first rehearing petition, whether or not the Commission considered additional evidence.

Section 10—113(a) of the Act addresses rehearing petitions. The ICC may rescind, alter, or amend an order, and any party to such an order may file an application for rehearing within 30 days of its service, but "[n]o ap-

---

[2]The ICC, in its supplemental brief, states that it "has not claimed that the petitions for review were untimely, so that the appeals should be dismissed for lack of jurisdiction."

peal shall be allowed from any rule, regulation, order or decision of the Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission." 220 ILCS 5/10—113(a) (West 2002). Section 10—113(a) further provides, "Only one rehearing shall be granted by the Commission ***." 220 ILCS 5/10—113(a) (West 2000). The appellate court here correctly observed that neither the Act nor its accompanying regulations contain a second rehearing petition requirement. 343 Ill. App. 3d at 529. That requirement is a gloss placed upon the Act by decades-old cases from this court.

In *Alton R.R. Co. v. Illinois Commerce Comm'n*, 407 Ill. 202 (1950), we addressed whether a putative appellant must file a second rehearing petition where the ICC has considered new evidence upon rehearing. We noted that the Act implies such a requirement by providing that an appellant may not raise any issues that were not included in a rehearing petition. *Alton R.R.*, 407 Ill. at 207. Because the ICC considered new evidence upon rehearing, we held that the putative appellant should have filed a second rehearing petition discussing that evidence "as a condition precedent to its right to appeal." *Alton R.R.*, 407 Ill. at 208. Accord *City of Edwardsville v. Illinois Commerce Comm'n*, 412 Ill. 34, 36-37 (1952).

Again, in *Scherer Freight Lines, Inc. v. Illinois Commerce Comm'n*, 24 Ill. 2d 359 (1962), we revisited the second rehearing petition requirement and focused on the purpose of the relevant statutory provisions: "The requirement of an application for rehearing as a condition to an appeal and the limitation that no person on appeal shall rely on any ground not set forth in such application for rehearing clearly disclose the underlying policy that any person aggrieved by a decision of the Commission must first give the Commission an op-

portunity to correct its alleged errors before resorting to the courts." *Scherer Freight*, 24 Ill. 2d at 363-64. Although the order upon rehearing was labeled a "reaffirming" order, and its substance was similar to the Commission's initial order, it still recited that it was "based upon the entire record, including evidence not before the Commission when the first order was entered." *Scherer Freight*, 24 Ill. 2d at 364. The appellants' initial rehearing petition argued that the ICC's decision was against the manifest weight of the evidence, but because they did not give the ICC an opportunity to reevaluate the manifest weight of the new evidence when they neglected to file a second rehearing petition, we held that the trial court properly dismissed their appeals. *Scherer Freight*, 24 Ill. 2d at 364.

In *Continental Air Transport Co. v. Illinois Commerce Comm'n*, 38 Ill. 2d 563 (1967), we carved out an exception to the second rehearing petition requirement, which was plainly implied by our language in *Scherer Freight*. "[I]f an order entered after rehearing does not substantially modify the first one and is not based upon any additional evidence, an appeal therefrom may be taken without a second petition for rehearing." *Continental Air*, 38 Ill. 2d at 566. We broadened this exception in *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550 (1971). Even if the ICC considers new evidence upon rehearing, an appellant need not file a second rehearing petition where the order upon rehearing is substantially the same as the initial order. *Du Page Utility*, 47 Ill. 2d at 553.

The exception now nearly swallows the rule. Unless the new evidence upon rehearing prompts the ICC to make major changes to its order, the party seeking an appeal need not seek a second rehearing. Here, under this exception, the LECs properly appealed the ICC's order on rehearing. As the ICC acknowledged in that order, on

the primary lines issue, "no party has presented any matter that was not previously before the Commission at the time of the entry of the Second Interim Order." More importantly, its order on rehearing reaches the same conclusion on this issue as its initial order—namely, that the Illinois USF supports only primary residential and business lines.

Having decided that subsequent cases have drained the potency from the *Alton R.R.*'s second rehearing petition requirement, we also note that that requirement sprang from an interpretation of the pre-1986 version of the Act. Before 1986, a litigant appealed an ICC decision to the trial court. Ill. Rev. Stat. 1983, ch. 111½, par. 72. In 1986, the General Assembly exercised its constitutional authority (see Ill. Const. 1970, art. VI, § 6) and directed appeals from ICC decisions to the appellate court. Now, a litigant can appeal either an ICC order refusing an application for rehearing or an ICC order "upon and after a rehearing" immediately to the appellate court "for the purpose of having the reasonableness or lawfulness of the rule, regulation, order or decision inquired into and determined." 220 ILCS 5/10—201(a) (West 2002). "[R]ules governing other civil cases," *i.e.*, supreme court rules, govern such an appeal. 220 ILCS 5/10—201(b) (West 2002); see also 155 Ill. 2d R. 335 ("Insofar as appropriate," supreme court rules on appellate procedure are applicable to proceedings for direct appellate court review of administrative agency orders). Under Supreme Court Rule 303(a)(2), "No request for reconsideration of a ruling on a post-judgment motion will toll the running of the time within which a notice of appeal must be filed under this rule." 155 Ill. 2d R. 303(a)(2).

When the legislature redirected judicial review of an ICC order from the trial court to the appellate court, it ensured that after one rehearing petition was decided,

the order was final and appealable. If we were now to revitalize *Alton R.R.* and its second rehearing petition requirement, we would create great havoc for ICC appeals. A putative appellant would be at the mercy of the ICC, watching the clock tick on its appeal while waiting for the Commission to rule on its second rehearing petition. Here, the ICC closed its order on rehearing by noting that "subject to the provisions of Section 10—113 of the Public Utilities Act ***, this Order is final as to all matters determined herein." As a final order "upon and after a rehearing," it was appealable under section 10—201(a). See 220 ILCS 5/10—201(a) (West 2002). The appellate court correctly rejected the ICC's argument.

## The Primary Lines Limitation

The central issue in this appeal is the ICC's construction of section 13—301(d), which incorporates section 13—301(e)(1), of the Act. This issue is one of statutory interpretation and involves nothing more than determining what the General Assembly meant when it ordered the ICC to define the services that constitute "universal service" in accord with the FCC's list of supported services. On this issue, our review proceeds *de novo*. See *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 397 (1998) ("the Commission's interpretation of a question of law is not binding on a court of review"), citing *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994); accord *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995) ("we are not bound by the Commission's interpretation of law"); see also 220 ILCS 5/10—201(e)(iv)(C) (West 2002) (providing that a reviewing court must reverse an ICC order if it violates state or federal law). Though we owe deference to the ICC's interpretation of the Act where there is a reasonable debate about its meaning (see *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d

142, 152 (1983); *Bloom Township High School v. Illinois Commerce Comm'n*, 309 Ill. App. 3d 163, 174 (1999), citing *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992); *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board*, 143 Ill. App. 3d 898, 907 (1986)), the provisions at issue here are quite clear.

In section 13—102(a) of the Public Utilities Act, the General Assembly found that "universally available and widely affordable telecommunications services are essential to the health, welfare and prosperity of all Illinois citizens." 220 ILCS 5/13—102(a) (West 2002). Accordingly, in section 13—103(a), the General Assembly announced a state policy that "telecommunications services should be available to all Illinois citizens at just, reasonable, and affordable rates and that such services should be provided as widely and economically as possible in sufficient variety, quality, quantity and reliability to satisfy the public interest." 220 ILCS 5/13—103(a) (West 2002). In section 13—301(d), the legislature referred specifically to the findings and policy in sections 13—102 and 13—103, and then ordered the ICC to

"investigate the necessity of and, if appropriate, establish a universal service support fund from which local exchange telecommunications carriers who pursuant to [Commission orders] received funding and whose economic costs of providing services for which universal service support may be made available exceed the affordable rate established by the Commission for such services may be eligible to receive support, less any federal universal support received for the same or similar costs of providing the supported services; provided, however, that if a universal service support fund is established, the Commission shall require that all costs of the fund be recovered from all local exchange and interexchange telecommunications carriers certificated in Illinois on a competitively neutral and nondiscriminatory basis. In establishing any such universal

service support fund, the Commission shall, in addition to the determination of costs for supported services, consider and make findings pursuant to paragraphs (1), (2), and (4) of item (e) of this Section." 220 ILCS 5/13—301(d) (West 2002).

Under section 13—301(e)(1), the Commission shall "[d]efine the group of services to be declared 'supported telecommunications services' that constitute 'universal service'. *This group of services shall, at a minimum, include those services as defined by the Federal Communications Commission and as from time to time amended.*" (Emphasis added.) 220 ILCS 5/13—301(e)(1) (West 2002). "Service," in the Act, "is used in its broadest and most inclusive sense." 220 ILCS 5/3—115 (West 2002).

The FCC has identified nine services as eligible for support through the federal USF, including "voice grade access to the public switched network," which it defines as "a functionality that enables a user of telecommunications services to transmit voice communications, including signalling [*sic*] the network that the caller wishes to place a call, and to receive voice communications, including receiving a signal indicating there is an incoming call." 47 C.F.R. § 54.101(a)(1) (1998); see 343 Ill. App. 3d at 530-31 (stating that a voice grade access line is a basic telephone line). In its order establishing the federal USF, the FCC found that voice grade access "is an essential element of telephone service, *** essential to education, public health, and public safety because it allows consumers to contact essential services such as schools, health care providers, and public safety providers. For this reason, it is also consistent with the public interest, convenience, and necessity." *In re Federal-State Joint Board on Universal Service*, 12 F.C.C.R. 8776, 8810-11, par. 63 (1997); see also *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 148 (1983) (describing "the capacity for two-way communica-

tion by voice" as the "essential of the concept of the telephone"), citing *People v. Gervasi*, 89 Ill. 2d 522 (1982).

The FCC further observed that the Federal-State Joint Board on Universal Service

"recommended that support be provided (1) for designated services carried on a single connection to a subscriber's primary residence, and (2) for designated services carried to businesses located in rural, insular and other high cost areas and with only single connections. The Joint Board concluded that single-connection residences and single-connection businesses both require access for health, safety, and employment reasons. The Joint Board found that support for a second connection is not necessary for a household to have 'access' to telecommunications and information services ***.

The Joint Board recommended that support for designated services be limited to those carried on a single connection to a subscriber's primary residence and to businesses with only a single connection." *In re Federal-State Joint Board on Universal Service*, 12 F.C.C.R. at 8828-29, pars. 94 through 95 (1997).

The FCC conceded that it shared the Joint Board's concerns that providing universal service support for multiple lines may be inconsistent with the goals of universal service. *In re Federal-State Joint Board on Universal Service*, 12 F.C.C.R. at 8829, par. 95 (1997). Presumably, individuals and businesses with multiple lines could afford to pay higher rates that shadow their carriers' higher costs. *In re Federal-State Joint Board on Universal Service*, 12 F.C.C.R. at 8829, par. 95 (1997). The FCC still chose to support all lines:

"In light of our determination *** to adopt a modified version of the existing universal service support system for high cost areas, we conclude, consistent with the proposal of the state Joint Board members, that all residential and business connections in high cost areas that currently receive high cost support should continue to be supported ***. For rural telephone companies this means that both multiple business connections and multiple residential con-

nections will continue to receive universal service support at least until January 1, 2001." *In re Federal-State Joint Board on Universal Service*, 12 F.C.C.R. at 8829, par. 96 (1997).

Since then, the FCC has not changed its stance. The federal USF supports all lines.

Our primary rule of statutory interpretation is to ascertain and effectuate the legislature's intent. See *In re D.D.*, 196 Ill. 2d 405, 418 (2001); *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). The language of the statute remains the best indication of this intent, and we must give the statutory terms their ordinary meaning. See *People v. Alexander*, 204 Ill. 2d 472, 485 (2003), citing *Opyt's Amoco, Inc. v. Village of South Holland*, 149 Ill. 2d 265, 277 (1992). Where the language of a statute is clear, we may not read into it exceptions that the legislature did not express. See *In re D.L.*, 191 Ill. 2d 1, 9 (2000), quoting *Garza v. Navistar International Transportation Corp.*, 172 Ill. 2d 373, 378 (1996).

The Act provides that the ICC should track the FCC definition of supported services, and the FCC has stated that voice grade access is a supported service. Further, the FCC has decided that all lines with voice grade access should receive federal USF support. It is incongruous to suggest that the legislature wanted the ICC to follow the FCC's words but not its deeds and to provide purportedly "universal service" support with limitations. The FCC does not describe a voice grade access line as a voice grade access line which receives support only if it is also a primary residential or business line. Universal service means universal service.

Though the ICC refers us to testimony and statements by various witnesses who represent companies opposed to support for multiple lines and advance their opinions to that effect, these opinions have no bearing on our determination of legislative intent. In fact, these witnesses do little more than parrot the position of the ICC

before the FCC in the *Federal-State Joint Board* case.[3] When the ICC ordered that "[t]he services defined by the FCC as supported services shall be the state supported universal services for purposes of the Fund, *with the exception that* the fund shall be based upon support for a single residential or business line" (emphasis added), it violated the Act. The appellate court correctly reversed the ICC.

## Retroactivity

The ICC contends that the appellate court erred in making its decision on the primary lines issue retroactive to the date of the ICC order on rehearing. The ICC refers to *Independent Voters of Illinois v. Illinois Commerce Comm'n*, 117 Ill. 2d 90, 97 (1987), which held that a rate order remains in effect during the pendency of an appeal. According to the ICC, though the present case involves a subsidy, not a rate, the appellate court essentially ordered a retroactive surcharge for telephone customers across Illinois because local exchange and interexchange carriers will pass on to their customers the USF charges which accrued while the ICC's order was in effect.

The LECs respond that the appellate court was correct. They assert that because March 13, 2002, was the date when the ICC's order first reduced funding for multiple lines, the appellate court simply placed the parties in the same positions they occupied before the ICC limited the USF to single lines and reduced funding. The LECs further assert that a rate case is inapposite because the USF is a surcharge levied against contributing carriers, not a rate charged to utility customers.

The appellate court reversed the ICC on the primary

---

[3]Merwin Sands, a witness for MCI Worldcom, Inc., testified, "[I]n comments filed at the FCC ***, the Illinois Commerce Commission *** proposed that the federal universal service fund should provide support to services provided only over primary residential access lines."

lines issue, as well as "that portion of the Commission's orders reducing the amount of funding by the percentage of secondary lines." The appellate court made its reversals retroactive to March 13, 2002, the date of the Commission order on rehearing. Though, as the ICC correctly notes, the appellate court offered no reason why its decision should operate retroactively, the appellate court sought to place the parties in the position they would have held without the primary lines limitation and consequent reduction in the fund size. The appellate court simply ensured that the effect of its ruling on the primary lines issue would not be defeated by a gap in funds. See 155 Ill. 2d R. 366(a)(5) (a reviewing court may, in its discretion, "make any other and further orders and grant any relief *** that the case may require"). The appellate court did not err.

## CONCLUSION

For these reasons, the judgment of the appellate court is affirmed.

*Affirmed.*