Nos. 2--05--0685 & 5--05--0465 cons.          filed: 11/29/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| STRATEGIC ENERGY, LLC, | ) | Petition for Review of Order of the |
| | ) | Illinois Commerce Commission |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ICC Docket No. 04--0811 |
| | ) | (No. 2--05--0685) |
| ILLINOIS COMMERCE COMMISSION, | ) | |
| | ) | |
| Respondent-Appellee | ) | |
| | ) | |
| (Local Union Nos. 15, 51, and 702, | ) | |
| International Brotherhood of Electrical | ) | |
| Workers, Intervenors-Appellees). | ) | |

| | | |
|---|---|---|
| STRATEGIC ENERGY, LLC, | ) | Petition for Review of Order of the |
| | ) | Illinois Commerce Commission |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | ICC Docket No. 04--0811 |
| | ) | (No. 5--05--0465) |
| ILLINOIS COMMERCE COMMISSION, | ) | |
| | ) | |
| Respondent-Appellee | ) | |
| | ) | |
| (Local Union Nos. 15, 51, and 702, | ) | |
| International Brotherhood of Electrical | ) | |
| Workers, Intervenors-Appellants). | ) | |

JUSTICE KAPALA delivered the opinion of the court:

Petitioner, Strategic Energy, LLC (Strategic), appeals from an order of the Illinois Commerce

Commission (Commission) granting Locals 15, 51, and 702 of the International Brotherhood of

Electrical Workers (union) leave to intervene in Strategic's application for a certificate of service authority to operate as an alternative retail electrical supplier (ARES). The union appeals from the Commission's orders granting Strategic's application and issuing a certificate of service authority. For the reasons that follow, we dismiss Strategic's appeal, and on the union's appeal, we reverse the Commission's orders.

FACTS

1. Proceedings Before the Commission

Strategic, a Delaware corporation licensed to do business in Illinois, is a supplier of retail electricity to nonresidential consumers. It is headquartered in Pittsburgh, Pennsylvania. The union represents union electrical utility workers. On December 29, 2004, Strategic filed an application for a certificate of service authority to operate as an ARES under section 16--115 of the Public Utilities Act (Act) (220 ILCS 5/16--115 (West 2004)) to provide retail electricity to Illinois's nonresidential retail customers with annual electrical consumption greater than 15,000 kilowatt-hours (kWh) in the Commonwealth Edison (ComEd) and Illinois Power (IP)[1] service territories in the State of Illinois. Strategic is majority owned by Great Plains Energy, Incorporated, a regulated public utility holding company that also owns Kansas City Power and Light (KCP&L), which is an integrated, regulated electric utility that supplies electricity to customers in Missouri and Kansas. According to Strategic's filings before the Commission, it does not purchase electricity from KCP&L. On January 6, 2005, Strategic published notice of its filing for a certificate of service authority in the newspaper officially designated by the state for this purpose.

An alternative retail electric supplier is:

_____

[1]Illinois Power is now known as AmerenIP. We will use IP throughout this opinion.

"[E]very person, cooperative, corporation, municipal corporation, company, association, joint stock company or association, firm, partnership, individual, or other entity, their lessees, trustees, or receivers appointed by any court whatsoever, that offers electric power or energy for sale, lease or in exchange for other value received to one or more retail customers, or that engages in the delivery or furnishing of electric power or energy to such retail customers, and shall include, without limitation, resellers, aggregators and power marketers ***." 220 ILCS 5/16--102 (West 2004).

In order for the Commission to grant Strategic a certificate of service authority to operate as an ARES, it must make findings that Strategic has demonstrated that it meets the requirements of section 16--115(d). 220 ILCS 5/16--115(d) (West 2004).

The union filed a petition to intervene on January 27, 2005. In its petition to intervene, the union argued its reasons for intervention as well as its reasons for opposing Strategic's application. The next day, January 28, 2005, the administrative law judge (ALJ) filed his proposed order granting Strategic's application, but with conditions. The order was silent with respect to the union's petition to intervene. The order recited that briefs on exceptions were due February 2, 2005. See 83 Ill. Adm. Code §200.830 (1996) (any party may file exceptions to statements, findings of fact, or rulings of law made by the ALJ in the proposed order in a "brief on exceptions"). On that date, Strategic filed exceptions to the ALJ's proposed order. Strategic also filed a verified objection and motion to strike the union's petition to intervene. The union, although permitted to do so by the rules, did not file exceptions to the ALJ's proposed order.

In a written order on February 7, 2005, the ALJ denied the union's petition to intervene. In its review of the ALJ's proposed order, on February 8, 2005, the Commission, in a written order,

granted Strategic's application in full, without the conditions proposed by the ALJ. The union's petition to intervene was not before the Commission when it entered its February 8, 2005, order. Then on February 24, 2005, the union filed with the Commission an application for rehearing of the order granting Strategic's application, and it also requested the Commission to review the ALJ's denial of its petition to intervene. On March 9, 2005, the Commission granted both the union's application for rehearing and its petition to intervene. The matter was referred back to the ALJ for rehearing of Strategic's application, and on June 13, 2005, the ALJ entered a proposed order on rehearing in which he ordered that the Commission's February 8, 2005, order granting Strategic's application should remain in full force and effect. On July 13, 2005, the Commission entered its order on rehearing in which it reaffirmed its decision to allow Strategic's application, and it declined to change its order allowing the union to intervene.

### 2. Proceedings in the Appellate Court

On July 14, 2005, Strategic filed in this court its petition for direct review (notice of appeal) from the Commission's July 13 order. On appeal, Strategic challenges that part of the order that allowed the union to intervene. The union and the Commission filed motions to dismiss Strategic's appeal on the basis that Strategic did not file an application for rehearing of the July 13 order and so did not exhaust its administrative remedies. Meanwhile, the union filed its timely appeal in the Fifth District of the Appellate Court on August 15, 2005. On September 21, 2005, before briefs were filed, this court denied the motions to dismiss Strategic's appeal. The clerk of the Fifth District Appellate Court then transferred the union's appeal to this court, and on November 16, 2005, this court consolidated the union's appeal with Strategic's appeal.

### ANALYSIS

1. Motions Taken With the Case

Before we entertain the merits of these appeals, we must dispose of several motions we ordered taken with the case.

A. Strategic's Motion to Strike Portions of the Union's and the Commission's Briefs

Strategic moves to strike those portions of the union's and the Commission's briefs that argue that, because Strategic did not exhaust its administrative remedies, this court lacks jurisdiction over Strategic's appeal. Strategic claims that this court finally disposed of that argument when we denied the motions to dismiss the appeal on September 21, 2005, and that this court may not revisit that order. Strategic is mistaken. The denial of a motion to dismiss an appeal is not final, and the question of our jurisdiction to hear a case may be revisited at any time before final disposition of the appeal. In re C.J., 325 Ill. App. 3d 502, 503-04 (2001). We address the argument that Strategic failed to exhaust its administrative remedies below in section 1D of this opinion. Accordingly, we deny the motion to strike those portions of the appellees' briefs.

B. Strategic's Motion To Strike the Union's Response to Strategic's Motion to Dismiss the

Union's Appeal

Strategic also moves to strike the union's response to Strategic's motion to dismiss the union's appeal. Strategic contends that the union's response was not timely filed. Supreme Court Rule 361(b)(2) (Official Reports Advance Sheet No. 22 (October 26, 2005), R. 361(b)(2), eff. January 1, 2006) provides that a response to a motion be filed within 10 days after mailing of the motion, if service is by mail. According to Strategic's certificate of service, it mailed the motion to dismiss the union's appeal on October 27, 2005. The union's response was mailed on November 10, 2005, and

was file stamped by the clerk of the appellate court on November 14, 2005.  Thus, Strategic is correct that the union's response was untimely.  Accordingly, we grant Strategic's motion to strike it.

Strategic further claims that the second part of the union's response contains a reply to Strategic's arguments in opposition to the union's motion to consolidate the appeals.  Strategic contends that the union did not have leave of court to file that reply.  See Official Reports Advance Sheet No. 22 (October 26, 2005), R. 361(b)(2), eff. January 1, 2006 ("Except by order of court, replies to responses will not be allowed").  Having stricken the response as untimely, we take no position on whether the union's argument constitutes a reply.

C. Strategic's Motion to Dismiss the Union's Appeal

Strategic's final motion is to dismiss the union's appeal.  Strategic cites section 10--201(a) of the Act, which provides that a party affected by the Commission's order or decision may appeal to "the appellate court of the judicial district in which the subject matter of the hearing is situated." 220 ILCS 5/10--201 (West 2004).  In the event that the subject matter of the hearing is situated in more than one district, then the order or decision may be appealed to any one of such districts.  This section further provides:

> "The court first acquiring jurisdiction of any appeal from any rule, regulation, order
>
> or decision shall have and retain jurisdiction of such appeal and of all further appeals from
>
> the same rule, regulation, order or decision until such appeal is disposed of in such appellate
>
> court." 220 ILCS 5/10--201(a) (West 2004).

Strategic interprets this to mean that the Second District first acquired jurisdiction and that the union's later filing of its appeal in the Fifth District was a nullity.  It seeks to support its argument that the Fifth District did not acquire jurisdiction with the case of Illinois Bell Telephone Co. v.

Illinois Commerce Comm'n, 414 Ill. 275 (1953). The question in that case was whether the circuit court of Kane County or the superior court of Cook County had jurisdiction of the appeal from the decision of the Commerce Commission. Illinois Bell, 414 Ill. at 282. Our supreme court said that both courts could not have acquired jurisdiction because "[t]here can be a valid appeal to one court only from a decision of the Commerce Commission." Illinois Bell, 414 Ill. at 282. The flaw in Strategic's argument is that it does not recognize that there is but one Illinois Appellate Court.

Article VI, section 11, of the Illinois Constitution of 1870 authorized legislation to create appellate courts in districts formed for that purpose. Renshaw v. General Telephone Co., 112 Ill. App. 3d 58, 60 (1983). The legislature implemented this constitutional provision when it created four separate appellate courts in the state. Renshaw, 112 Ill. App. 3d at 60. These four separate appellate courts remained in existence until the revision of the judicial article of the Constitution of 1870 in 1962. Renshaw, 112 Ill. App. 3d at 60. The electors of Illinois amended the judicial article at an election held on November 6, 1962, the changes to become effective on January 1, 1964. Renshaw, 112 Ill. App. 3d at 60. One alteration wrought by the new judicial article was to create one appellate court organized into five districts for the selection of judges. Renshaw, 112 Ill. App. 3d at 60-61.

Article VI of the Illinois Constitution of 1870 was again amended with the adoption by the electors of Illinois of the new Illinois Constitution of 1970, which again provided that the judicial power was vested in a supreme court, "an" appellate court, and circuit courts. Renshaw, 112 Ill. App. 3d at 61, quoting Ill. Const. 1970, art. VI, §1. Article VI, section 2, "still divided the State into five judicial districts for the selection of judges of the supreme and appellate court." (Emphasis in original.) Renshaw, 112 Ill. App. 3d at 61. The contrast between the Constitution of 1870, together

with the 1962 amendment to the judicial article, and the present Constitution of 1970 caused the court in <u>Renshaw</u> to declare that there is but one Illinois Appellate Court with five districts, not five autonomous appellate courts. <u>Renshaw</u>, 112 Ill. App. 3d at 61-62. Indeed, our supreme court has unequivocally stated: "Although the appellate court is divided into five districts for purposes of election [citation], Illinois has but one unitary appellate court." <u>People v. Ortiz</u>, 196 Ill. 2d 236, 255 (2001). Consequently, a timely filing in the wrong district of the appellate court is regarded as timely filed in the proper district. <u>Renshaw</u>, 112 Ill. App. 3d at 64.

Section 10--201(a) of the Act does not conflict with this interpretation. It speaks to venue when it provides that the order of the Commission may be appealed to any district of the appellate court where the subject matter is situated. It further provides that all appeals from the order or decision of the Commission shall be heard by "such" appellate court, indicating a single appellate court. This means that the appeals from the Commission's orders were properly in this district, because Strategic filed its appeal in this district before the union filed its appeal in the Fifth District. At that point, the union's appeal simply was pending in the wrong district of the appellate court, and the clerk of the Fifth District properly transferred it to the clerk of the Second District pursuant to Supreme Court Rule 365 (155 Ill. 2d R. 365).

Moreover, <u>Illinois Bell</u>'s inapplicability to our case is apparent. It was decided before the legislature provided for direct review of the Commission's orders by the appellate court, before the effective date of the 1962 changes to the judicial article of the Constitution of 1870, and before the adoption of the Constitution of 1970. Accordingly, Strategic's motion to dismiss the union's appeal is denied.

D. The Union's and the Commission's Motions to Dismiss Strategic's Appeal

We turn now to the union's and the Commission's renewed motions to dismiss Strategic's appeal on the ground that Strategic did not exhaust its administrative remedies. The union and the Commission originally filed motions to dismiss Strategic's appeal on this ground before the parties filed their briefs. A panel of this court denied the motion, and the union and the Commission have raised the issue again in their briefs. They contend that before Strategic could appeal, it was obliged to seek rehearing before the Commission of either (1) the March 9, 2005, order allowing the union to intervene or (2) that part of the July 13, 2005, order on rehearing that reaffirmed the March 9 order allowing the union to intervene. See 220 ILCS 5/10--113(a) (West 2004). However, before we consider this issue, we first address the Commission's argument that Strategic cannot appeal from the Commission's orders because it was the successful party below.

We agree with the Commission that Strategic was not adversely affected by the union's intervention. The Commission granted Strategic's ARES application in full without conditions and issued it a certificate of service authority in the February 8, 2005, order and did not in any way modify its decision with respect to Strategic in its July 13, 2005, order on rehearing. While Strategic argues that it was prejudiced by the union's petition to intervene because the union's actions caused uncertainty among Strategic's potential customers and in the market as a whole, these effects are undocumented in the record.

"A party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for *** cannot appeal from the judgment." Material Service Corp. v. Department of Revenue, 98 Ill. 2d 382, 386 (1983). The general rule is that the successful party cannot appeal from those parts of a decree that are in its favor in order to reverse other aspects of the decree. N-Rem Corp. v. Illinois Commerce Comm'n, 98 Ill. App. 3d 1076, 1078

(1981).  The appellate forum is not afforded to successful parties who may not agree with the reasons, conclusions, or findings below.  Geer v. Kadera, 173 Ill. 2d 398, 414 (1996).  The union's intervention did not result in any alteration of the complete relief awarded to Strategic, and we see no reason to depart from this general rule in this case.

At oral argument, Strategic contended that we should resolve the issue of whether the statute allows intervention in ARES applications because it will face this issue in the future and is, thereby, harmed by the intervention.  However, we evaluate only whether prejudice resulted at the time the order allowing intervention was entered.  See City of Bloomington v. Westinghouse Electric Corp., 824 F.2d 531, 536-37 (7th Cir. 1987).  The fact remains that Strategic prevailed in its application before the Commission.

Even if Strategic did not receive all it asked of the Commission, we believe this appeal is subject to dismissal because Strategic failed to file an application for rehearing before the Commission on the issue of intervention.  It is undisputed that Strategic did not file an application for rehearing from either the March 9, 2005, order or the July 13, 2005, order on rehearing.  Strategic argues that Harrisonville Telephone Co. v. Illinois Commerce Comm'n, 212 Ill. 2d 237 (2004), exempts it from the requirement of section 10--113(a) of the Act.  That section provides in relevant part:

"Within 30 days after the service of any rule or regulation, order or decision of the

Commission any party to the action or proceeding may apply for a rehearing in respect to any

matter determined in said action or proceeding and specified in the application for rehearing.

***    No appeal shall be allowed from any rule, regulation, order or decision of the

Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission." 220 ILCS 5/10--113(a) (West 2004). Harrisonville is inapposite and does not relieve Strategic of its statutory obligation to file an application for rehearing as a prerequisite for taking an appeal. Harrisonville addressed the situation in which a putative appellant must seek a second rehearing before the Commission when the Commission heard additional evidence on rehearing. Harrisonville, 212 Ill. 2d at 244. Harrisonville did not involve circumstances, as in this case, in which the putative appellant had filed no petition for rehearing. From the Commission's February 8, 2005, order, the union filed an application for rehearing in which the union specified the grant of ARES certification to Strategic as the matter for rehearing. The Commission took no new evidence on rehearing. Strategic does not provide us with authority for the proposition that it may preserve its right to appeal by raising an extraneous issue in response to its opponent's application for rehearing.

Strategic urged for the first time at oral argument that the Commission's July 13, 2005, order on rehearing rendered futile any application for rehearing on the issue of intervention. We do not consider this argument because it was not raised in Strategic's brief. Points not asserted in a party's brief are waived and shall not be raised for the first time in oral argument. Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(c), eff. October 1, 2001; Phillips v. Gannotti, 327 Ill. App. 3d 512, 519 (2002).

Even if this argument were not waived, we reject it. On March 9, 2005, the Commission granted the union's application for rehearing of the order that granted Strategic ARES certification. That issue was remanded to the ALJ. Neither party introduced additional evidence in front of the ALJ. Both parties submitted their arguments in what were called "briefs on rehearing." In its briefs

on rehearing, Strategic raised the issue of the union's right to intervene, even though intervention was not before the ALJ for reconsideration. The Commission's July 13, 2005, order affirming its grant to Strategic of a certificate of service authority merely noted that the issue of intervention was not before the Commission:

> "Although raised as an issued [sic] by Strategic in its [b]riefs on [r]ehearing and responded to by the IBEW, the Commission declines to revisit its decision to grant the IBEW's petition to intervene through interlocutory review and the subsequent decision to grant the petition for rehearing."

In our view, the Commission did not foreclose Strategic's ability to raise the intervention issue in the proper context, that is, by timely filing its own application for rehearing of the Commission's order allowing the union to intervene; rather, the Commission refused only to entertain the issue as part of the proceeding on the union's application for rehearing of the ARES certificate of authority.

Accordingly, Strategic's appeal is dismissed.

## II. The Union's Appeal

### A. Background

We next consider the merits of the union's appeal. In order to understand the union's contentions, some additional background is helpful. Traditionally, a retail electric customer purchased several different services, including the electricity itself, from the local electric utility as a single "bundled" service. Commonwealth Edison Co. v. Illinois Commerce Comm'n, 322 Ill. App. 3d 846, 848 (2001). Bundled service consisted of the electricity as well as all services related to the distribution and delivery of electricity. Commonwealth Edison, 322 Ill. App. 3d at 848. After passage of article XVI of the Act, known as the Electric Service Customer Choice and Rate Relief

Law of 1997 (Customer Choice Law) (220 ILCS 5/16--101 (West 2004)), a retail customer eligible for open access could choose to continue purchasing bundled service from its local utility, or it could purchase electricity as a separate, "unbundled" service from, among others, an ARES. Commonwealth Edison, 322 Ill. App. 3d at 848. "The Customer Choice Law introduced competition for the first time into the Illinois electricity market and moved the Illinois electric industry from a heavily regulated world toward a competitive marketplace." Local Union Nos. 15, 51, & 702 v. Illinois Commerce Comm'n, 331 Ill. App. 3d 607, 608-09 (2002) (IBEW).

Two electric utilities are involved in this case, ComEd and IP. They serve different geographic areas. At the time Strategic filed its application for a certificate of service authority as an ARES, ComEd and IP had ceased generating electricity. ComEd purchased its electricity from a regional transmission organization (RTO) called PJM Interconnection (PJM), and IP purchased its electricity from an RTO called Midwest Independent Transmission System Operator (MISO). According to Strategic's application, with their integration into the RTOs, ComEd and IP no longer operate and manage their own transmission systems. The function of the RTOs is to manage the flow of electricity over the transmission systems and to ensure the systems' reliability. According to Strategic, the electric utilities still distribute electricity to the retail customers. In its application, Strategic proposed to purchase electricity from PJM and MISO, the same sources of ComEd's and IP's electricity, and then sell it to its customers in the respective ComEd and IP geographic areas.

The Customer Choice Law opened the market to an ARES such as Strategic. However, the legislature was also concerned that Illinois electrical utilities, such as ComEd and IP, which had undertaken certain investments in infrastructure, should be able to maintain a reasonable opportunity to obtain a return on their investments. IBEW, 331 Ill. App. 3d at 616. The legislature was mindful

that new entrants into the market might take an unreasonable advantage of the investments made by the formerly regulated utilities. IBEW, 331 Ill. App. 3d at 616. To address this concern, the legislature enacted section 16--115(d)(5) of the Act, known as the reciprocity provision. Section 16--115(d)(5) of the Act provides:

"(5) That if the applicant, its corporate affiliates or the applicant's principal source of electricity (to the extent such source is known at the time of the application) owns or controls facilities, for public use, for the transmission or distribution of electricity to end-users within a defined geographic area to which electric power and energy can be physically and economically delivered by the electric utility or utilities in whose service area or areas the proposed service will be offered, the applicant, its corporate affiliates or principal source of electricity, as the case may be, provides delivery services to the electric utility or utilities in whose service area or areas the proposed service will be offered that are reasonably comparable to those offered by the electric utility, and provided further, that the applicant agrees to certify annually to the Commission that it is continuing to provide such delivery services and that it has not knowingly assisted any person or entity to avoid the requirements of this Section. For purposes of this subparagraph, 'principal source of electricity' shall mean a single source that supplied at least 65% of the applicant's electric power and energy, and the purchase of transmission and distribution services pursuant to a filed tariff under the jurisdiction of the Federal Energy Regulatory Commission or a state public utility commission shall not constitute control of access to the provider's transmission and distribution facilities." 220 ILCS 5/16--115(d)(5) (West 2004).

In its application, Strategic asserted that it is using PJM and MISO, which are its principal sources of electricity, to satisfy the reciprocity provision. In supplying electricity to customers in the ComEd area, Strategic would acquire 100% of its electricity from PJM. In supplying electricity to customers in the IP area, Strategic would procure 100% of its electricity from MISO. Strategic concluded that "the Illinois electricity market provides a relatively level playing field upon which traditional electric utilities and ARES can compete." This "relatively level playing field" came about, Strategic wrote, as a result of the utilities divesting themselves of generating assets, the recovery of stranded costs through customer transition charges, and the move to RTOs. Indeed, Strategic asserts that as a result of these changes, it is not possible any longer for an ARES to take unreasonable advantage of the affected utilities.

The only appellate court case to address the reciprocity provision is IBEW. In IBEW, an entity known as WPS Energy Services, Inc. (WPS), was the ARES applicant. IBEW, 331 Ill. App. 3d at 610. WPS stated on its application that Wisconsin Public Service Corp. and Upper Peninsula Power Company were its affiliates. IBEW, 331 Ill. App. 3d at 610. None of the territories of either of the affiliates was open to Illinois utilities. IBEW, 331 Ill. App. 3d at 610. Nevertheless, the Commission granted the application on the basis that electric power and energy could not be "physically and economically delivered" by the Illinois utilities to the service area of WPS's affiliates. IBEW, 331 Ill. App. 3d at 610. The Commission read the statute as creating an exception where power could not be physically and economically delivered. In contrast, the appellate court interpreted the statute to require that power must be physically and economically delivered and, if it could not be, the application must be denied. IBEW found that the Commission's construction of the statute was inconsistent with the legislature's intent and held that, before "the Commission grants

a certificate of service authority, it must find that the applicant complies with each condition set forth in section 16--115(d)(5)." IBEW, 331 Ill. App. 3d at 617. IBEW found that there are three such conditions: (1) the applicant, its corporate affiliates, or the applicant's principal source of electricity owns or controls facilities, for public use, for the transmission or distribution of electricity to end users within a defined geographic area to which Illinois utilities can physically and economically deliver power and electricity; (2) the applicant, its corporate affiliates, or principal source of electricity, as the case may be, provides delivery services to the electric utility or utilities in whose service area or areas the proposed service will be offered that are reasonably comparable to those offered by the electric utility; and (3) the applicant agrees to certify its compliance annually to the Commission. IBEW, 331 Ill. App. 3d at 616.

In its brief, Strategic is correct in noting that IBEW did not consider the meaning of principal source of electricity, which is at issue in our case.

## B. The Commission's Findings

Section 16--115 provides that the Commission shall grant the application for a certificate of service authority if it makes the findings set forth in subsection (d). 220 ILCS 5/16--115 (West 2004). In its February 8, 2005, order, the Commission found in pertinent part:

"The Commission recognizes that there have been fundamental changes in Illinois' electric markets. In fact, the Customer Choice and Rate Relief Law of 1997 brought about many of these changes. The Commission also recognizes the continuing evolution of the wholesale market and the increasing importance of RTOs, especially as they pertain to Illinois. As such, the Commission must consider the changes in the electric market when

evaluating the requirements of [s]ection 16--115(d)(5) of the Act or the Appellate Court's decision in IBEW.

\* \* \*

Any concern about providing Applicant an opportunity to take an unreasonable advantage over the existing utilities by allowing a new entrant into the Illinois utility market, without providing the Illinois utilities affected by the new entrant an opportunity to also compete in the market of the new entrant, is resolved through Applicant's use of PJM and MISO as principal sources of electricity. Both PJM and MISO offer delivery services reasonably comparable to those offered by Illinois utilities. Additionally, Illinois utilities have the opportunity to participate in both PJM and MISO's electricity markets. Thus, the Commission finds that within the meaning of the Appellate Court's decision in IBEW, granting Applicant a certificate will not allow the new entrant to take an unreasonable advantage of the investments made by the formerly regulated industry."

In its order on rehearing dated July 13, 2005, the Commission also made certain findings, set forth here in relevant part:

"The Commission in its original order recognized that there have been fundamental changes in Illinois' electric markets. The Commission also recognized the continuing evolution of the wholesale market and the increasing importance of RTOs, especially as they pertain to Illinois. The Commission continues to agree \*\*\* that PJM and MISO may be considered principal sources of electricity to satisfy condition one of the reciprocity requirements \*\*\*.

\* \* \*

Given the new landscape of the Illinois electricity markets, the Commission finds that the applicant's use of PJM and MISO as principal sources of electricity satisfies the reciprocity requirements. Neither ComED nor AmerenIP possess [sic] generating capacity any longer, having sold or transferred the units off to non-regulated affiliates or unrelated companies. Both PJM and MISO offer delivery services reasonably comparable to those offered by Illinois utilities. Additionally, Illinois utilities have the opportunity to participate in both PJM's and MISO's electricity markets."

### C. The Union's Contentions

The union in this appeal makes four arguments regarding the reciprocity provision in support of reversing the Commission's orders: (1) Strategic's utility affiliate, KCP&L, is not located in a jurisdiction that is accessible to Illinois utilities; (2) PJM and MISO procure electricity from jurisdictions that are not open to competition from Illinois utilities; (3) PJM and MISO acquire electricity from multiple sources and cannot satisfy the requirement that Strategic obtain 65 % of its electricity from a single source; and (4) PJM and MISO are not markets in which Illinois utilities may compete, but are transmission delivery systems from distant generation sources, and as such, do not offer reasonably comparable delivery services to the Illinois utilities.

We hold that PJM and MISO do not provide delivery services that are reasonably comparable to those provided by the electric utilities, as defined by statute, and, therefore, cannot meet the reciprocity requirement. For this reason, we do not reach the union's other contentions.

### D. Standard of Review

This case presents an issue of statutory interpretation on which our review is de novo. Harrisonville, 212 Ill. 2d at 247. Although we owe deference to the Commission's interpretation of

the statute where there is a reasonable debate about its meaning (see Harrisonville, 212 Ill. 2d at 247), we believe the statute here is not ambiguous.

E. Principal Source of Electricity

Either the applicant, its corporate affiliates, or the applicant's principal source of electricity may satisfy the reciprocity requirements of section 16--115(d)(5). 220 ILCS 5/16--115(d)(5) (West 2004). In its application, Strategic says it is using its principal source of electricity to satisfy reciprocity, and it then designates PJM and MISO as its principal source of electricity in the ComEd and IP service areas, respectively. The issue is whether PJM and MISO fulfill the conditions set forth in the reciprocity provision.

In IBEW, the Fifth District of the Appellate Court resolved a disagreement that arose over the meaning of the word "if" in the first line of section 16--115(d)(5), ruling that each condition of the reciprocity provision must be met in order for the Commission to issue a certificate of service authority. The question before us is whether PJM and MISO meet the criteria of the reciprocity provision. The principal source of electricity must fulfill conditions one and two of section 16--115(d)(5). Condition three is required of the applicant only. As we determine that PJM and MISO do not meet the second condition, we end our inquiry there.

Section 16--102 of the Act defines "delivery services":

" 'Delivery services' means those services provided by the electric utility that are necessary in order for the transmission and distribution systems to function so that retail customers located in the electric utility's service area can receive power and energy from suppliers other than the electric utility, and shall include, without limitation, standard metering and billing services." 220 ILCS 5/16--102 (West 2004).

The first part of the definition dictates that delivery services must be provided by the electric utility. The second part prescribes that delivery services are those that enable retail customers in the electric utility's service area to receive power and that they include standard metering and billing services. Pursuant to section 16--115(d)(5), PJM and MISO must provide ComEd and IP with what we will refer to as "reciprocal services." These are delivery services that ComEd and IP may access to reach end users in PJM's and MISO's defined geographic area. These reciprocal services must be reasonably comparable to the delivery services ComEd and IP offer.

Strategic and the Commission argue that the reciprocity statute contemplates that an entity other than an electric utility can provide delivery services, and that because of the "new realities" of the market, the transmission services provided by the RTOs are reasonably comparable to the distribution services provided by the electric utilities. Without deciding whether PJM and MISO can meet the "electric utility" component of delivery services, we find that PJM and MISO cannot meet the reciprocal services requirement of the reciprocity statute because they do not provide to ComEd and IP the panoply of services enumerated in section 16--102, which enable retail customers to receive power.

If Strategic were allowed to operate as an ARES, ComEd and IP would provide the services necessary to deliver power from the RTOs to retail customers of Strategic. Whatever the exact nature of these services is, it is undisputed that PJM and MISO do not and cannot provide to ComEd and IP reasonably comparable services in the defined geographic area in which PJM and MISO operate. Strategic has not demonstrated that PJM and MISO are anything other than wholesale providers of power. According to the record in this case, they do nothing to move power from the transmission lines to retail customers.

Strategic and the Commission assert that the reciprocity provision requires only that the principal source of electricity provide delivery services that are reasonably comparable, not identical, to those offered by the electric utility. They note that the first condition of section 16--115(d)(5) provides that the principal source of electricity own or control facilities, for public use, for the transmission or distribution of electricity. Hence, they argue that the legislature contemplated that the bundle of delivery services would be broken down and entities such as RTOs would step in to provide elements of the delivery services that the electric utilities provided at the time the statute was written. Because PJM and MISO provide ComEd and IP access to their transmission facilities, Strategic and the Commission assert that ComEd's and IP's ability to participate in PJM's and MISO's markets means that PJM and MISO have reciprocated delivery services reasonably comparable to those offered by the electric utilities. We disagree.

Section 16--115(d)(5) does not provide that the principal source of electricity must provide the electric utility with a piece of the bundle of delivery services, but requires that it provide "delivery services." 220 ILCS 5/16--115(d)(5) (West 2004). Even if section 16--115(d)(5) required PJM and MISO to provide only a piece of the bundle of delivery services, PJM and MISO must provide services that are reasonably comparable to those provided by the electric utility. 220 ILCS 5/16--115(d)(5) (West 2004). In their briefs, Strategic and the Commission confirm that ComEd and IP no longer transmit electricity. Therefore, because the transmission facilities that PJM and MISO provide to ComEd and IP are not comparable to the delivery services that ComEd and IP offer, ComEd and IP's use of PJM and MISO's transmission facilities does not fulfill the reciprocity provision in section 16--115(d)(5).

Strategic and the Commission spend much time explaining how the Illinois electricity market has changed since the Customer Choice Law was written and since the IBEW decision. In their briefs, they assert that ComEd and IP are no longer vertically integrated. Restructuring has resulted in transmission services being provided by the RTOs, distribution services being provided by the electric utilities, and "independent agents" able to provide metering and billing services. They claim that the restructuring that occurred after the Customer Choice Law has made it impossible for an ARES to take unreasonable economic advantage of the electric utilities, and that, therefore, the anticompetitive reciprocity provision is no longer needed.

We understand the problems posed by the changes in the market; however, any changes in the statute to reflect market realities must be made by the legislature, not this court. In drafting the reciprocity provision, the legislature incorporated the phrase "delivery services," which it defined in section 16--102 "for purposes" of the Customer Choice Law. 220 ILCS 5/16--102 (West 2004). The definition that the legislature adopted is not ambiguous. "It is axiomatic that where the language of a statute is plain and unambiguous, the only role of the court is in its application." In re M.M., 156 Ill. 2d 53, 69 (1993). In M.M., our supreme court declared, "We have no authority either to amend or to annex a statute." M..M., 156 Ill. 2d at 69. "Any alteration to the statute, regardless of any perceived benefit or danger, must necessarily be sought from the legislature." M. M., 156 Ill. 2d at 69.

## CONCLUSION

We conclude that the Commission's interpretation of section 16--115(d)(5) is not consistent with the legislative intent as expressed in the wording of the statute. Its finding that Strategic's "use of PJM and MISO as principal sources of electricity satisfies the reciprocity requirements" ignores

the plain language of the statute. The legislature saw fit to incorporate the statutory definition of "delivery services" into the reciprocity provision and has not evinced an intent that the statutory definition in the reciprocity provision differ from the definition in section 16--102. Accordingly, the orders of the Commission are reversed. Strategic's appeal is dismissed.

No. 2--05--0685, Appeal dismissed.

No. 5--05--0465, Reversed.

GROMETER, P.J., and BYRNE, J., concur.